[No. G037484. Fourth Dist., Div. Three. Jan. 29, 2008.]

THE PEOPLE, Plaintiff and Respondent, v.
ANTHONY DOUGLAS SEMINOFF, Defendant and Appellant.

COUNSEL

Harry Zimmerman, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Peter Quon, Jr., and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BEDSWORTH, J.**—This is a case in which the trial court was confronted with a witness—appellant's girlfriend and codefendant—who, after giving critical testimony in a suppression hearing, invoked her Fifth Amendment rights and refused to answer crucial questions on cross-examination. The trial court struck her testimony and denied the Penal Code section 1538.5 motion based on the testimony of the police who participated in the search.

That is, obviously, a drastic sanction, and Anthony Douglas Seminoff appeals on the bases the court erred both in striking the testimony and in finding the search constitutionally sound. We find both contentions unmeritorious. The court's sanction was reasonable under the circumstances, and the only testimony properly received on the motion supported the court's approval of the search.

### FACTS

On the morning of March 27, 2005, Bassett was staying at a Holiday Inn in Placentia. While she was sleeping in her room, her four-year-old son Timothy came down to the lobby and reported he was unable to wake his mother up. An employee of the hotel went up to the room and tried to awaken Bassett, but he was also unsuccessful.

Police Officer Brad Butts was dispatched to the hotel "to assist the fire department with the possible medical aid of a female." He arrived at 11:52 a.m., and upon being briefed on the situation, went to Bassett's room with three fire department paramedics. Butts knocked on the door and, using an "elevated" voice, announced "Placentia Police Department. Come to the door or make your presence known." No one answered, and Butts did not hear any

sounds coming from the room. After about 30 seconds, he swiped the key card, opened the door a few inches and made the same announcement. Again, there was no response. He waited another 30 seconds and then entered the room alone.

The room was dark and smelled heavily of marijuana. Holding his gun and flashlight, Butts checked the area around the doorway. When he opened the closet behind the front door, the odor of marijuana got even stronger. Butts ventured on, looking for Bassett and trying to make sure the room was safe for the paramedics to enter. In the "living room area," he noticed a couple of hunting knives and a loaded magazine for a handgun. He continued to announce his presence, but no one responded.

As he made his way into the "bedroom area," he noticed a baggie of methamphetamine on a desk and Bassett lying on the bed. He pulled back the curtains, holstered his weapon and tried to awaken her by shaking her arm and calling to her. When she did not respond, he summoned the paramedics. They were focused on their medical duties and unable later to recall the strong odor of marijuana noted by Officer Butts. They jostled Bassett until she finally awoke. Although groggy, she said she was fine; she did not appear to be injured and insisted her failure to respond was a function of being a heavy sleeper.

Having seen the gun magazine, Butts asked her if there were any firearms in the room. She said there were two, and when Butts asked if he could look for them, she said yes. When he asked where they were, she said she was not sure; she simply directed Butts to a couple of places she thought they might be, including the nightstand, the dresser and a briefcase that was on the floor at the foot of the bed.

While the paramedics were still attending to Bassett, Butts began searching for the guns. Upon opening the drawer on the nightstand, he found a pipe and a baggie of methamphetamine. Then, after checking the dresser, he opened the briefcase and saw a .357 revolver, a digital scale and a pouch full of baggies. Butts then turned his attention back to Bassett, asking her where the other gun might be. Just then, one of the paramedics lifted up a pillow by Bassett, revealing a nine-millimeter pistol that Butts recovered. Butts also found some paperwork belonging to Seminoff in the room.

Before long, Police Officer Jason Reger arrived with young Timothy and reunited him with his mother. Reger noticed a strong odor of marijuana inside the room. After the paramedics left, he and Butts asked Bassett to sign a consent-to-search form, but she refused. She said Seminoff had been staying in the room with her, and a short time later he was arrested outside in the parking lot.

Sergeant Daron Wyatt subsequently arrived on the scene and was briefed by Butts as to what had transpired. While they were talking in the hallway, Wyatt detected a strong odor of marijuana coming from the room. He obtained a warrant to search the room, and when the warrant was executed later that day, the police found a duffel bag containing 46 pounds of marijuana inside the closet by the front door.

Seminoff and Bassett moved to suppress the contraband found in the room. They argued Butts's warrantless entry into the room was not justified by exigent circumstances, and he had no right to question Bassett after she said she was okay.[1] Defendants also challenged Butts's credibility, particularly his claims he smelled marijuana in the room, saw methamphetamine in plain view, and had Bassett's permission to look in the briefcase. The prosecution took the position that Butts was credible and had acted reasonably in responding to a call for medical assistance. The court agreed. It found exigent circumstances existed for Butts to enter the room, Bassett voluntarily consented to the search of the briefcase and there were no material omissions or misstatements in the search warrant. Accordingly, the court denied the motion to suppress. Seminoff then pleaded guilty to various drug charges and was sentenced to 16 years in prison.

I

During the suppression motion, Bassett testified for the defense. However, after she repeatedly invoked her right against self-incrimination on cross-examination, the court struck her testimony. Seminoff contends this constituted prejudicial error. We disagree.

At the outset of Bassett's testimony, the court asked her if she understood she was subject to cross-examination and her testimony could be used against her in any court proceeding. She answered yes, and defense counsel confirmed Bassett intended to waive her Fifth Amendment rights.

On direct examination, Bassett testified she arrived at the hotel room four days before the search. She said she drove there from Arizona with Timothy and Seminoff, but they were staying with relatives for the most part; only once did Seminoff visit her at the room, and Timothy did not join her there until the night before the search.

On the morning of the search, she was asleep on the bed when Butts briskly pulled off her blankets. Wearing only a bra and sweat pants, she sat up and tried to cover herself with the blankets, but Butts pulled them off again

---

[1] The latter contention was not renewed on appeal.

and started peppering her with questions about the room and Seminoff. Bassett was bewildered. She asked for her son, and while she was waiting for him to arrive at the room, the paramedics came in and began examining her. Butts started opening a drawer on the nightstand, but she shut it and told him he needed a warrant to search. He had not asked for permission to open the drawer, nor had he said anything to her about searching the room. However, he did ask her if there were any guns in the room. She said there were two, one under her pillow and one in the briefcase. Butts seized the guns without asking her permission to do so. Then he had her get out of the bed, gave her some clothes and asked her to sign a consent form. When she refused to sign the form, he arrested her for child endangerment.

Bassett testified the only methamphetamine that was in the room was in her purse. And the marijuana in the closet was thickly wrapped with packaging materials, covered with clothes and draped with wet towels. This, Bassett claimed, masked the smell of the marijuana and prevented it from permeating into the room. In fact, she insisted the room did not smell of marijuana at all.

On cross-examination, Bassett testified she came to California for a vacation. When the prosecutor asked her whether she brought the marijuana with her from Arizona, defense counsel objected and asserted Bassett's privilege against self-incrimination. Defense counsel argued the question was irrelevant to the suppression hearing, but the court overruled the objection. Bassett then admitted she transported the marijuana from Arizona in her vehicle.

The prosecutor then asked her if she intended to sell the marijuana, and that prompted the same objection from defense counsel. Again, the court overruled the objection. It warned defense counsel that unless Bassett answered the prosecutor's questions, the court would strike her testimony in its entirety. The court then took a short break to allow defense counsel to converse with Bassett.

When the hearing resumed, defense counsel said Basset was willing to proceed with cross-examination on a question-by-question basis. He also indicated that, based on the court's previous rulings, she was willing to answer questions about whether she intended to sell the marijuana. However, when the prosecutor asked her that question, defense counsel objected on both relevancy and Fifth Amendment grounds. In overruling the objections, the court stated, "cross-examination should be allowed to reveal whether or not, among other things, [Bassett] has a coherent credible story about the events involved, whether or not she can remember details, whether or not she has an interest in the outcome." The court also told defense counsel that if

Bassett continued to invoke her privilege against self-incrimination, it would have no choice but to strike her testimony. When defense counsel responded that Bassett was not going to answer the prosecutor's questions about the marijuana, the court did just that.

Seminoff contends the court abused its discretion in striking Bassett's testimony because the questions to which she invoked her privilege against self-incrimination were collateral to the issues presented at the suppression hearing. He further contends the court's ruling deprived him of a fair hearing in violation of due process and his right to compulsory process under the Sixth Amendment. We find no abuse of discretion or violation of Seminoff's constitutional rights.[2]

■ When a defendant refuses to answer questions on cross-examination on the ground it may incriminate him, the court is faced with a constitutional dilemma. If the court strikes the defendant's testimony, its ruling implicates his " 'right to a fair opportunity to defend against the State's accusations,' " which is a component of due process. (*People v. Reynolds* (1984) 152 Cal.App.3d 42, 45 [199 Cal.Rptr. 379], quoting *Chambers v. Mississippi* (1973) 410 U.S. 284, 294 [35 L.Ed.2d 297, 93 S.Ct. 1038].) "Essential to a fair [hearing] is that the accused have the opportunity to exercise his fundamental, constitutional right to be heard in his own defense by testifying at [the hearing]. [Citations.]" (*Reynolds*, at pp. 45–46.)

However, "Defendant's constitutional right to testify in his own behalf must be considered in light of the principle that '[w]hen a defendant voluntarily testifies in his own defense the People may "fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." [Citation.]' " (*People v. Reynolds, supra,* 152 Cal.App.3d at p. 46.) "Defendant's refusal to answer relevant questions [may deprive] the prosecution its right to subject [his] claim[s] to 'the greatest legal engine ever invented for the discovery of truth,' cross-examination. [Citation.]" (*Ibid.*; see also *Fost v. Superior Court* (2000) 80 Cal.App.4th 724 [95 Cal.Rptr.2d 620] [recognizing tension between a defendant's right to present evidence and the People's right of cross-examination].)

In deciding whether to strike a defendant's or a defense witness's testimony based on his or her refusal to answer one or more questions, the trial court should examine " 'the *motive* of the witness and the *materiality* of the

---

[2] Appellant admits his attorney did not raise any constitutional objections in the trial court. However, we will consider his constitutional claims to foreclose his argument that counsel was ineffective for failing to do so.

answer.' [Citation.]" (*People v. Reynolds, supra,* 152 Cal.App.3d at p. 47.) The court should also consider if less severe remedies are available before employing the "drastic solution" of striking the witness's entire testimony. (*Id.* at pp. 47–48.) These include striking part of the testimony or allowing the trier of fact to consider the witness's failure to answer in evaluating his credibility. (*Id.* at p. 48; *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1248 [268 Cal.Rptr. 884].)

Bassett admitted on direct examination that she knew about the 46 pounds of marijuana that were found in her hotel closet. She testified at length about how the marijuana was packaged and gave her opinion that it did not give off any odor in the room. In light of this testimony, the Attorney General contends Bassett's refusal to answer questions about whether she transported the marijuana from Arizona and possessed it for sale deprived the prosecution of the "opportunity to test the foundation of her direct examination."[3]

The Attorney General's point is well taken. Whether Bassett personally transported the marijuana and intended to sell it were questions that had a clear and logical bearing on her connection to the marijuana and her knowledge of how it was packaged. These answers directly touched upon her interest in the case and were therefore crucial to assessing her credibility. For instance, if Bassett had testified she transported the marijuana from Arizona with the intent to sell it, that might have bolstered her credibility, since such statements would have been against her penal interest.[4] On the other hand, if Bassett had claimed the 46 pounds of marijuana was for personal use, that rather implausible assertion likely would have had the opposite effect on her credibility. Almost anything she said about the marijuana would have been pertinent to an assessment of her credibility. Indeed, we cannot imagine how a trier of fact could assess her testimony about the search without understanding her stake in the marijuana.

While Seminoff does not dispute Bassett's credibility was an important issue at the hearing, he argues the preclusion of cross-examination into matters affecting her credibility did not justify the court in striking her testimony. His argument is based in part upon *Board of Trustees v. Hartman* (1966) 246 Cal.App.2d 756 [55 Cal.Rptr. 144], but the court in that case actually suggested that the right of cross-examination trumps the right of self-incrimination when the credibility of a witness is central to the proceedings at hand. (*Id.* at p. 765.) There can be little doubt, as *Hartman* indicated,

---

[3] Bassett did admit transporting the marijuana, but only after the court overruled her Fifth Amendment objection.

[4] Even though such statements could not have been used as substantive evidence of her guilt, they could have been used against her for impeachment purposes if the case had gone to trial and she had decided to take the stand in her own defense. (*People v. Boyette* (2002) 29 Cal.4th 381, 415, fn. 5 [127 Cal.Rptr.2d 544, 58 P.3d 391].)

that the right of cross-examination takes on added significance where the witness's credibility is of special significance to the proceedings. (*Ibid.*)

■ Generally speaking, a defendant is "not entitled to place [his witness's] testimony before the [trier of fact] free from any threat of impeachment" by the prosecution, even if the witness has a valid Fifth Amendment privilege. (*People v. Hecker, supra*, 219 Cal.App.3d at pp. 1246–1249.) "There are . . . exceptionally few caveats to the proposition that the right to introduce evidence necessarily implicates the responsibility to permit it to be fairly tested. As the Supreme Court has said, a criminal defendant ' "has no right to set forth to the jury all the facts which tend in his favor without laying himself open to cross-examination upon those facts." ' " (*Fost v. Superior Court, supra*, 80 Cal.App.4th at p. 736, fn. omitted, quoting *Brown v. United States* (1958) 356 U.S. 148, 155 [2 L.Ed.2d 589, 78 S.Ct. 622].)

Granted, there are instances where the cross-examiner's questions are so peripheral to the case that the witness's refusal to answer them does not justify the sanction of striking. For example, in *U.S. v. Negrete-Gonzales* (9th Cir. 1992) 966 F.2d 1277, the defendant offered highly exculpatory evidence from a codefendant about his lack of involvement in an undercover drug sale. However, on cross-examination the codefendant refused to name the source of the drugs, and the court struck her testimony. On appeal, the Ninth Circuit found this to be error because "the identity of the unknown suppliers [was] only peripherally related to [her] direct testimony." (*Id.* at p. 1280; see also *United States v. Lord* (9th Cir. 1983) 711 F.2d 887 [same].)

■ Here, however, the issues of Bassett's credibility and her connection to the marijuana were too important to the suppression hearing to categorize them as "peripheral." These issues were pivotal: If the trial court had believed Bassett's story and her testimony about the marijuana, it would almost certainly have granted defendants' suppression motion. The whole case hinged upon her credibility. The ability of the prosecution to test that credibility and probe the basis of her knowledge regarding the marijuana was a sine qua non to resolution of the motion.

We recognize the trial court did not expressly contemplate any remedies short of a complete striking in deciding what to do in the face of Bassett's repeated assertion of her Fifth Amendment rights. However, defense counsel did not offer any. And on appeal the only thing Seminoff suggests the trial court could have done is to allow Basset to invoke her privilege on a question-by-question basis. But that is essentially what the trial court did. The court, in fact, proposed this very approach and defense counsel consented to its use. The court did not make a precipitous ruling on the issue or strike Bassett's testimony the first time she refused to answer a question; rather it

entertained full argument from the parties and made a specific ruling on each of the four occasions that Bassett invoked her privilege.

Other lesser sanctions are simply indistinguishable from the one employed under the circumstances of this case. The trial court, for example, could have refused to strike the testimony but then completely discounted its credibility because Bassett had refused cross-examination: Different sanction, same result.

As the trier of fact at the hearing, the court was able to determine *exactly* how important Bassett's credibility was. Its determination that cross-examination was imperative to assess Bassett's credibility and place her direct examination in its full and proper context was reasonable. Striking Bassett's direct testimony, although drastic, was a legitimate response to her refusal to answer the prosecutor's questions. Considering the totality of the circumstances, we cannot say the court abused its discretion in so doing. Nor did it violate Seminoff's right to due process or present evidence.

## II

Seminoff also challenges the substance of the court's ruling denying his motion to suppress. He contends Butts's initial entry into Bassett's room was unlawful, and without the fruits of that illegal entry there was insufficient evidence to support the search warrant. However, we agree with the Attorney General that exigent circumstances clearly justified Butts's warrantless entrance into the room. Therefore, we affirm the trial court's ruling.

■ " '[W]arrants are generally required to search a person's home or his person unless "the exigencies of the situation" make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment.' [Citation.] [¶] One exigency obviating the requirement of a warrant is the need to assist persons who are seriously injured or threatened with such injury. ' "The need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." ' [Citations.]" (*Brigham City v. Stuart* (2006) 547 U.S. 398, 403 [164 L.Ed.2d 650, 126 S.Ct. 1943, 1947].) Absolute proof of an imminent emergency is not required: A warrantless entry will be justified if there is probable cause to believe there is a risk of danger to persons inside the dwelling. (*Minnesota v. Olson* (1990) 495 U.S. 91, 100 [109 L.Ed.2d 85, 110 S.Ct. 1684]; *People v. Celis* (2004) 33 Cal.4th 667, 676 [16 Cal.Rptr.3d 85, 93 P.3d 1027].)

The facts surrounding Butts's entrance into Bassett's hotel room are undisputed. After four-year-old Timothy came to the lobby and reported he

was unable to awaken his mother, an employee of the hotel went up to Bassett's room and tried to wake her up. The record does not reveal what the employee did in this regard, but the attempt was unsuccessful. Butts arrived at the hotel around noon to assist in the situation. With three paramedics in tow, he went to Bassett's room and knocked on the door. In an "elevated voice," he announced, "Placentia Police Department. Come to the door or make your presence known." No response or sound was forthcoming. After waiting 30 seconds, he swiped the key card, opened the door slightly and repeated the announcement. Then another 30 seconds passed without a response. At that point, Butts made his way into the room.

If there is one thing four-year-old boys are usually good at, it is waking their parents. So, the report of Timothy walking into the hotel lobby and reporting he could not wake his mother would have been enough to put any reasonable person on notice that something might be seriously wrong with Bassett. It was, after all, the middle of the day, not the time that most parents of young children are at luxury to doze off. And Timothy was not the only one who could not wake Bassett up; neither could the hotel worker, and neither could Butts, at least from outside the room. Despite his knocking and repeated announcements, he heard no sounds coming from the room.

Under these circumstances, it would have constituted a dereliction of duty for Butts to turn around and abandon his investigation. (See *People v. Ammons* (1980) 103 Cal.App.3d 20, 31 [162 Cal.Rptr. 772] [in the context of a warrantless home entrance, "the preservation of human life is paramount to the right of privacy protected by the constitutional guarantees . . ."].) To be sure, an unanswered knock on the door is not enough to justify a warrantless police entrance, even if the officer has a general suspicion there is someone inside that might need help. (*People v. Smith* (1972) 7 Cal.3d 282, 286–287 [101 Cal.Rptr. 893, 496 P.2d 1261].) Speculation the person has "fainted, fallen sick, or otherwise become incapacitated to the point of rendering her . . . in need of police assistance" will not suffice in this regard, for the simple reason the police are not allowed to conjure up their own emergency to justify a warrantless entry. (*Id.* at p. 287.)

This case involved more than mere speculation, however. Based on the evidence of Timothy wandering into the lobbying in search of help and the numerous failed attempts to awaken Bassett, there was an objectively reasonable basis for Butts to suspect Bassett was in serious risk of danger. Therefore, he was justified in entering her hotel room without a warrant.

Indeed, the exigency of the situation demanded nothing less. Accordingly, we find the trial court properly denied Seminoff's motion to suppress evidence.[5]

The judgment is affirmed.

Rylaarsdam, Acting P. J., and O'Leary, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 14, 2008, S161658.

---

[5] In light of this holding, we need not consider the Attorney General's alternative argument that Butts's entrance into the hotel room was justified under the "community caretaker" exception to the warrant requirement. (See generally *People v. Ray* (1999) 21 Cal.4th 464 [88 Cal.Rptr.2d 1, 981 P.2d 928].)