182 Cal.App.4th 1626 (2010)
THE PEOPLE, Plaintiff and Respondent,
v.
DONALD SANDERS, Defendant and Appellant.
No. B206569.
Court of Appeals of California, Second District, Division Eight.
February 24, 2010.
[As modified March 23, 2010.]
*1629 Steven Graff Levine; Law Offices of Dennis A. Fischer, Dennis A. Fischer and John M. Bishop for Defendant and Appellant.
Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steven D. Matthews and Timothy M. Weiner, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION
FLIER, J.
Appellant Donald Sanders shot two men, Joel M. and Joel's father, Rodney M., during a fight at a party of the Rare Breed Motorcycle Club (Rare Breed). We will refer to the victims as Joel and Rodney, to avoid confusion. They survived and testified against appellant, as did a third eyewitness, Lanny T. (Lanny). Appellant was convicted of two counts of attempted murder and two counts of assault with a firearm, plus firearms discharge and great bodily injury enhancements. He was sentenced to 64 years to life in prison.
Rodney and Lanny knew appellant, and they identified him as one of two shooters. Joel did not see who shot him, but he saw appellant running toward him before he was shot. As to the other shooter (S-1), Joel and Lanny erroneously selected another man, Johnny C., when they were shown a six-pack photographic lineup (six-pack). They corrected that mistake when they saw Johnny in a live lineup. Johnny was dismissed from the case prior to appellant's trial, and no one was tried as S-1. On the other hand, all three eyewitnesses were positive that appellant was one of the two shooters.
Appellant contends that his federal constitutional rights to due process of law and to confront and cross-examine witnesses were violated because the trial court did not strike all of Lanny's testimony or grant a motion for mistrial after Lanny refused to disclose the names of club members who approached him after the shootings and gave him information about S-1's identity. Appellant also contends that the trial court erred in imposing sentence. We find no merit in the contentions and therefore affirm.

*1630 FACTS

1. Prosecution Evidence

A. Background

Lanny was one of the cofounders of Rare Breed when the motorcycle club began in 1989. He was still active in the club in 2005, when the incident occurred. The club had over 100 members at that time. Some of them were law enforcement officers, and some were members of the Crips and Bloods street gangs.
Starting at 3:00 p.m. on September 11, 2005, Rare Breed held a huge party in Gardena to celebrate the grand opening of its clubhouse. The party was open to the public and to the members of various motorcycle clubs. Food and beverages, including alcoholic drinks, were served. There was music and dancing inside the clubhouse, and motorcycles were displayed outside.

B. Joel's Description of the Incident

Joel, who was in his mid-20's, was not a member of Rare Breed, but his father, Rodney, had been a member for years. Joel and Rodney assisted with providing and serving the food and beverages during the party. At some point, Joel noticed appellant, a bald-headed guest who was talking with other guests. Appellant was of Rodney's generation. Joel had never seen him before.
Around 10:30 or 11:00 p.m., the party was winding down. Joel, Lanny, Joel's girlfriend, and a female cousin of Joel's were among the 10 or so people still inside the club room. Joel was sweeping the floor. He had drunk alcoholic beverages during the party, but he did not consider himself drunk. He heard an unidentified man (S-1) say the word "blood" and use loud, profane language to the two young women. S-1 was accompanied by an unidentified companion (S-2). Like Joel, S-1 and S-2 were young males in their mid-20's.
The club room was separated from the barroom by a wall that had a door and a window through which drinks were passed. Rodney came into the club room from the barroom and said something to S-1 and S-2. Joel told S-1 the women were his girlfriend and cousin, and there was no need for hostility. He *1631 offered to get drinks for S-1 and S-2. S-1 responded with a profane insult. He hiked "up his pants with his fists" and stepped toward Joel as if preparing to fight. Joel was five feet seven inches tall and weighed 148 pounds. S-1 was much larger than that. Joel decided he had better hit first. He struck S-1, who fell to the ground on his back. Joel got on top of S-1 and repeatedly hit him in the face.
Although Joel's attention was focused on S-1, he saw appellant approach him quickly from the "left front." Within seconds, Joel was lifted up from behind and shot in the chest. He did not see who shot him and did not know how close appellant was to him at that time. He fell to the ground, heard more gunshots, and saw Rodney hunched over with his hands on his stomach.
Joel spent several weeks in the hospital recovering from three gunshot wounds. He did not recall receiving the second and third shot. The first shot, to the middle of his chest, caused a collapsed lung. The second shot hit his thigh and testicles. The third shot went across his forehead. While he was in the hospital, he was shown two six-packs by Detective Pohl. He circled appellant's photo in one six-pack because he recognized appellant as the person who approached him before he was shot. From the other six-pack he selected another man, later shown to be Johnny, as S-1.
After Joel and Rodney left the hospital, they drove together to see two live lineups. While en route, Rodney told Joel that the wrong man might have been selected as S-1. The six-packs had shown only faces, but the live lineups showed entire people. At the first live lineup, which included Johnny, Joel did not identify anyone as S-1. All the men in that lineup were approximately his size, but S-1 was much bigger. At the second live lineup, which included appellant, Joel again identified appellant.

C. Rodney's Description of the Incident

As the party was ending, Rodney was cleaning up in the barroom when he heard arguing in the club room. Leaning out the drinks window, he saw that S-1 and S-2, whom he had never seen before, were speaking disrespectfully to Joel's cousin and his girlfriend. S-1 and S-2 became more aggressive when he offered them drinks. He left the bar area, went into the club room, and spoke with them. At some point, one of them said "blood" or "Blood, blood," which could be a gang communication. Joel approached and told S-1 and S-2 that the women were his girlfriend and cousin. S-1 cursed and said he did not care. Lanny, who was nearby, attempted "to calm them down." Joel started fighting with S-1 and pinned him to the ground. Rodney grabbed S-2 and hit him in the head, as it looked like S-2 also wanted to fight.
*1632 At that point, Rodney saw appellant, whom he knew as "Duck," a member of another motorcycle club. Rodney had previously noticed appellant at the party. He first met appellant two years earlier at another Rare Breed dance and had seen him at other motorcycle group functions since then. Rodney thought appellant would help him to stop the younger men from fighting. Instead, appellant lifted up Joel by the back of the neck and shoulders and shot him in the chest.
Rodney charged at appellant, trying to save his son. Appellant pointed the gun at Rodney and fired. Rodney did not realize he had been shot. He kept moving toward appellant, heard another shot, and felt a bullet hit his knee. Falling to one knee, he saw that S-1 had risen from the ground and fired another gun, which then jammed. Appellant grabbed S-1 and ran outside with him. Rodney started to follow them, became aware that he was wounded in the stomach, and collapsed. He spent almost three months in the hospital and needed several operations.
Once Rodney was able to communicate at the hospital, Detective Pohl visited him and showed him a six-pack. Rodney circled appellant's photo on the six-pack and wrote, "He shot me." He was positive about that identification, as he knew appellant.
At the trial, Rodney also testified that he selected Johnny as S-1 when he was shown the other six-pack. Detective Pohl's testimony showed that Rodney was confused about that point. Pohl did not show Rodney the six-pack with Johnny's photo because Rodney told Pohl he focused his attention on appellant and did not believe he could identify the other gunman. Joel and Lanny, but not Rodney, identified Johnny as S-1 from the six-pack that contained Johnny's photo.
Rodney further testified that, after he was released from the hospital, the "older guys" in the neighborhood told him that the wrong person had been identified as S-1, as Johnny did not attend the party. Rodney wanted to be absolutely sure, to avoid having an innocent person incarcerated. People in the neighborhood also told him that his identification of appellant was wrong, but he rejected that information because he was acquainted with appellant and knew he had seen him.
Rodney told Joel prior to the live lineups that the six-pack identifications of S-1 might be incorrect. At the live lineups, Rodney did not recognize anyone in the first lineup, but he again selected appellant from the second lineup. He had no feud or "beef" with appellant prior to the shooting.

*1633 D. Detective Pohl

Detective Pohl obtained descriptions of the incident from Rodney, Joel and Lanny. Rodney told Pohl that appellant shot him, he had spoken with appellant at previous motorcycle events, appellant was known as "Duck," and he belonged to a motorcycle club called "Divided Times." When Pohl showed the three witnesses the six-pack with appellant's photo, Rodney and Lanny identified appellant as one of the two shooters, and Joel said he had seen appellant at the party. Joel and Lanny identified Johnny as the other suspect, S-1, from the other six-pack. When Pohl told Rodney that a live lineup was scheduled, Rodney said there were concerns about the identifications of S-1, but not of appellant. At the live lineups, the three witnesses identified appellant, and none of them identified Johnny.
On cross-examination, after the court overruled the prosecutor's relevancy objections, Detective Pohl explained that he put Johnny's picture into a six-pack because (1) Rodney, Lanny and Joel told him that S-1 was a local Blood gang member known as J; and (2) he learned from police gang records and a confidential reliable informant that J or "J-Wac" was the gang name of Johnny, who belonged to a local Blood gang. After Pohl learned that Johnny was not S-1, Johnny was released, and Pohl never found out the real identity of S-1. Pohl tried to get club membership information from Lanny, but Lanny would not provide it.

E. Lanny's Description of the Incident

Lanny drank no alcoholic beverages at the party. He was in the club room cleaning up when he saw appellant, whom he knew, enter the room with S-1 and S-2, whom he did not know. Lanny and Rodney were the only club members in the building at that time. S-1 was tall and wore a red sports jersey. S-1 and S-2 said "blood" while speaking to each other. S-1 spoke offensively to the two young women standing at the drinks window. Rodney told S-1 not to be disrespectful to females. Joel approached S-1.
At that point, Lanny positioned himself between Joel and S-1, hoping to stop a fight. Appellant stood off to the side. S-1 spoke aggressively and showed Lanny a gun in his waistband. Lanny tried to calm S-1. Joel stepped from behind Lanny and hit S-1, who fell to the ground. Joel continued fighting him while on top of him. S-1 pulled out his gun. Appellant, now also holding a gun, pulled Joel up by the collar. That action by appellant put Joel in a position to be shot by S-1. S-1 had trouble with his gun, but he shot Joel once. Appellant then shot Joel twice. The two women ran from the room. Rodney ran toward appellant, who shot Rodney twice. Appellant and S-1 ran outside. Lanny and Rodney followed them part of the way. S-1 and S-2 drove *1634 off together in a car. Appellant rode off on his motorcycle. Lanny then assisted Rodney, who was wounded.
When the police arrived, Lanny told them about the incident, identified appellant as one of the shooters, and indicated where appellant could be found. Lanny later selected a photo of appellant from a six-pack. Lanny also picked out, from another six-pack, a photo of a man who looked like S-1. When he saw a live lineup with that man in it, he realized that man was not S-1. Lanny was absolutely certain that appellant shot Rodney and Joel.
Lanny was extensively cross-examined about all of his direct testimony, including the incident, his previous identifications of the two shooters, and his preliminary hearing testimony. He insisted that the only people in the room were the ones he had already named. He explained that, even though members of motorcycle clubs do not like to come to court, he had been willing to do so because he witnessed the shootings and did not want the problem to "escalate to another level" on the street. In response to questions from defense counsel, he added that a couple of members of Rare Breed, whose names he refused to divulge, told him that S-1 was a Blood gang member whose nickname was J. He gave that information to the police. When he saw Johnny in a six-pack, he identified Johnny as S-1, because Johnny looked "similar" to S-1. He learned from unidentified people, prior to the live lineup, that he had mistakenly selected Johnny in the six-pack. He personally realized that mistake when he saw Johnny in a live lineup.
We will discuss, post, the problems during Lanny's re-cross-examination when defense counsel asked for the source of Lanny's information about S-1.

F. Deputy Vizcarra

Deputy Vizcarra arrived at the club room, saw paramedics treating Joel and Rodney, and interviewed Lanny. Lanny's description of the incident included the fact that one of the two shooters was "Duck," the president of another motorcycle club, "Divided Times."

2. Defense Evidence

A. Don C.

Don belonged to another motorcycle club and was a longtime friend of appellant's. When he arrived at the party about 9:15 p.m., he saw appellant across the street from the clubhouse building. Don went inside and saw about 60 people drinking and dancing in the club room. He later noticed a crowd in *1635 a corner, heard a gunshot, ran outside, and heard another gunshot inside the building. Appellant was still outside, across the street.

B. The Defense Criminalist

The hospital medical records of Joel and Rodney showed their blood-alcohol levels after they were shot. Joel's blood-alcohol level was 0.22 percent. In the opinion of the expert, that level meant that Joel would have been impaired, mentally and physically. Rodney's blood-alcohol level was 0.12 percent, which the expert believed was enough to impair Rodney's observations and memory.

C. Gary Austin

Austin, who was Johnny's defense attorney, gave the former prosecutor on the case the names of Johnny's alibi witnesses. Rodney approached Austin at the live lineup and apologized for his prior misidentification of Johnny.

D. Latanya G.

Latanya went to the Rare Breed party while Johnny, who was her neighbor, babysat for her at their apartment complex. Latanya arrived at the party around 9:00 p.m. Fifteen or 20 minutes later, she heard men arguing. One of the arguers was a tall man in a red jersey. The clubhouse was filled with people. Latanya left because the man in the red jersey raised his shirt at his waistband, as if he had a weapon. She saw appellant outside the building when she arrived at the party and when she left it. She heard gunshots as she was driving home. When she got there, she saw Johnny, whose nickname was J.[1]

E. Lori-Ann Jones

Jones was the former prosecutor on this case. Johnny was dismissed from it after the live lineup because the eyewitnesses said that Johnny was not S-1. Law enforcement officers later had information about S-1's real identity, but no one else was prosecuted as S-1 due to the past misidentification of S-1.

F. Detective Pohl

During his investigation, Detective Pohl spoke on the telephone with Detective Lewis, who belonged to Rare Breed. Lewis told Pohl that he was inside the building, in a bathroom, when he heard a popping noise that could have been gunshots.

*1636 3. Prosecution Rebuttal Evidence

Regina M.
Regina was Joel's girlfriend. Late in the party, as people were leaving, she was standing at the drinks window with a female friend. Someone behind her repeated the word "blood." She said, "Oh, s___," as she was concerned about gang trouble. One of the men cursed at her. Rodney came out from the bar area and Joel walked over. A fight started. Regina heard shots, so she ran with her girlfriend into the barroom. When she came out, she saw that Joel and Rodney were wounded. She left with Joel in the ambulance. She could not identify anyone.

DISCUSSION

1. Refusal to Strike Lanny's Testimony

During re-cross-examination, Lanny would not answer questions about who originally told him that a gang member named J was S-1, who later told him that Johnny had wrongly been identified as S-1, and who told him S-1's real identity. The trial court allowed very broad questioning on that issue and gave the jury a special instruction about it, but it refused to strike Lanny's testimony or grant a mistrial. Appellant contends that those rulings deprived him of his Sixth and Fourteenth Amendment rights to due process of law and to confront and cross-examine witnesses. (U.S. Const., 6th & 14th Amends.)

A. The Record

During re-cross-examination, defense counsel repeatedly asked for the source of Lanny's information that S-1 was a Blood gang member named J. Lanny said a couple of friends of his who knew J gave him that information, it "was pretty reliable," and he passed it on to law enforcement. He would not divulge who told him about J, as those people were "not involved in this." Defense counsel argued that the information led to "the identification [of] an innocent man," and it was needed to "understand the quality of the information you got from these people." The prosecutor made a relevancy objection. The court overruled the objection, finding that the questions were relevant because they concerned credibility and Lanny's ability to identify appellant. Lanny steadfastly refused to name his sources.
The court had the jurors go to the jury room. It told Lanny that he could be held in contempt of court if he continued to refuse to answer the questions. The prosecutor wondered whether answering the questions could put Lanny in physical danger. The courtroom was cleared. Lanny testified, on voir dire, *1637 that he had received the information in confidence, and not so that he could pass it on to the police. It was possible that he could be killed if he named his sources, as they were criminal types who possessed weapons and had reputedly engaged in harm. They had sought him out. They lived in the area of Compton and Gardena. He would refuse to disclose his sources even if the court ordered him to do that. After further discussion, the proceedings were adjourned to the following Monday.
When the proceedings resumed that Monday, Lanny still refused to name his sources. The prosecutor argued that Lanny needed counsel, the proceedings had become a trial of Johnny rather than of appellant, and what Lanny learned from other people about S-1's identity was unreliable, irrelevant hearsay. The defense maintained that there had been a denial of the rights to due process and cross-examination that required the striking of Lanny's testimony. The court ordered Lanny to name his sources. He refused. The court was concerned that the issue arose after Lanny had already given extensive testimony, and when the defense intended to call witnesses who would testify that appellant was not in the clubhouse when the shooting occurred. It believed Lanny's refusal to name his sources resulted from the "credo" of motorcycle clubs rather than a real fear of harm. After carefully considering its options, it decided that it would not strike Lanny's testimony but would give a special instruction and allow the defense wide latitude in further questioning of Lanny. A defense motion for mistrial was denied.
During further broad-ranging re-cross-examination, Lanny explained that there had been a meeting of about 100 Rare Breed members the previous day, at which he assured the members that he had not given out information about them. The same club members who originally told him about J later approached him and told him a mistake had been made, as S-1 was not Johnny but was a different Blood gang member who was also known as J. Lanny passed on that additional information to Detective Pohl without disclosing who gave it to him. He testified that his sources would have come to court themselves if they wanted their names known. The primary person who told him S-1's true identity had been at the club meeting the previous day. Lanny insisted that appellant knew who S-1 was, since appellant entered the club room with S-1 and S-2 before he shot Joel and Rodney.
The court's final instructions included this special instruction about Lanny's testimony: "If you find that Lanny . . . attempted to suppress evidence in any manner, such as by concealing potential evidence, or refusing to answer questions despite being ordered to do so by the court, you may consider this attempt as a circumstance tending to distrust the entirety of his testimony. You may reject the whole testimony of Lanny . . . as a result, unless, from all of the evidence, you believe the probability of truth favors his testimony in other particulars."

*1638 B. Analysis

(1) "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations. The rights to confront and cross-examine witnesses and to call witnesses in one's own behalf have long been recognized as essential to due process." (Chambers v. Mississippi (1973) 410 U.S. 284, 294 [35 L.Ed.2d 297, 93 S.Ct. 1038].)
"Where a witness refuses to submit to proper cross-examination regarding material issues, the striking out or partial striking out of direct testimony is common, and has been allowed even where the result was to deprive a criminal defendant of the fundamental constitutional right to testify in his own behalf. Striking a witness's entire testimony is, of course, a `drastic solution,' only to be employed `after less severe means are considered.'" (Fost v. Superior Court (2000) 80 Cal.App.4th 724, 736 [95 Cal.Rptr.2d 620], italics added (Fost), quoting People v. Reynolds (1984) 152 Cal.App.3d 42, 47-48 [199 Cal.Rptr. 379] (Reynolds).)
One of the "less severe remedies" is "allowing the trier of fact to consider the witness's failure to answer in evaluating his credibility." (People v. Seminoff (2008) 159 Cal.App.4th 518, 526 [71 Cal.Rptr.3d 582] (Seminoff).) That is the remedy the trial court chose here. It allowed extensive questioning on the subject of Lanny's refusal to disclose his source of information about the identity of S-1, the other shooter, and it gave a special instruction. Appellant contends that, instead, Lanny's testimony should have been stricken or the motion for mistrial should have been granted.
Respondent asks us to utilize an abuse of discretion standard and find that no abuse of discretion occurred. We cannot analyze the case on that basis, as the issue of federal constitutional error was raised below and has been repeated on appeal. We utilize independent review in analyzing the issue. (People v. Cromer (2001) 24 Cal.4th 889, 901-902 [103 Cal.Rptr.2d 23, 15 P.3d 243] [independent review, not abuse of discretion, standard applicable to whether witness was legally unavailable].)
(2) The choice of remedy depends chiefly on the motive of the witness and the materiality of the questions the witness refuses to answer. (Reynolds, supra, 152 Cal.App.3d at p. 47.) The critical question is whether the inquiry goes to a material issue from the witness's direct testimony, or a collateral issue that bears only on the witness's credibility. (United States v. Cardillo (2d Cir. 1963) 316 F.2d 606, 611, 613 (Cardillo).) Pursuant to a "well-established rule," it is inappropriate to totally strike a witness's testimony if the answer pertains to a collateral matter. (U.S. v. Negrete-Gonzales (9th Cir. 1992) 966 F.2d 1277, 1280 (Negrete-Gonzales).)
*1639 On the issue of whether unanswered questions are material or collateral, Cardillo, supra, 316 F.2d at page 613, identified "at least three categories" of possible factual situations. "The first would be one in which the answer would have been so closely related to the commission of the crime that the entire testimony of the witness should be stricken. The second would be a situation in which the subject matter of the testimony was connected solely with one phase of the case in which event a partial striking might suffice. The third would involve collateral matters or cumulative testimony concerning credibility which would not require a direction to strike and which could be handled (in a jury case) by the judge's charge if questions as to the weight to be ascribed to such testimony arose." (Ibid.)
(3) Cardillo concluded that the refusal of a witness named Ohrynowicz to answer questions on cross-examination did not require that his testimony be stricken, as the questions were "purely collateral[,] related solely to his credibility as a witness and had no relation to the subject matter of his direct examination." (Cardillo, supra, 316 F.2d at p. 611.) On the other hand, the questions that the witness Friedman refused to answer were material, as "[t]he answers solicited might have established untruthfulness with respect to specific events of the crime charged." (Id. at p. 613.) Therefore, Cardillo found that the trial court erred when it refused to strike Friedman's testimony.
Other cases cited by the parties have reached similar conclusions.
In People v. McGowan (1926) 80 Cal.App. 293, 298-299 [251 P. 643], the defendant testified that he was elsewhere with a young woman at the time the crime occurred. On cross-examination, he refused to identify the woman. McGowan found that the trial court properly struck the defendant's entire testimony, as the prosecution had no opportunity to subpoena the woman.
In Reynolds, supra, 152 Cal.App.3d 42, the defendant testified on direct examination that he lacked the intent to commit the charged crime, escape, because he broke the glass on his jail room window due to pressure from other inmates to allow drugs to be smuggled through the window. On cross-examination, he refused to name the inmates who pressured him. Reynolds found no abuse of discretion in the striking of the defendant's testimony, as his refusal to name the others in the group smuggling endeavor severely limited the prosecution's right to effective cross-examination. (Id. at p. 47.)
In Seminoff, supra, 159 Cal.App.4th 518, the issue concerned testimony by the codefendant, the defendant's girlfriend, at a suppression of evidence hearing. Testifying as a defense witness, she indicated on direct examination that she knew about a large quantity of marijuana in her hotel closet. On *1640 cross-examination, she refused to answer questions about whether the marijuana was transported from another state and whether it was possessed for sale. Seminoff found that the trial court properly struck her testimony, as "the issues of [her] credibility and her connection to the marijuana were too important to the suppression hearing to categorize them as `peripheral.'" (Id. at p. 527.)
In Negrete-Gonzales, supra, 966 F.2d 1277, a codefendant who had already pled guilty testified, as a defense witness, that she alone was responsible for an undercover drug sale. The trial court struck all of her testimony because, on cross-examination, she refused to identify the source of the drugs she sold. Negrete-Gonzales found that the trial court erred, as the identity of the witness's drug supplier was a collateral matter that "only peripherally related to" her direct testimony. (Id. at p. 1280.)
(4) Here, Lanny testified on direct examination that he knew appellant, saw appellant shoot Joel and Rodney, and previously identified appellant from both a six-pack and a live lineup. Regarding the other shooter, S-1, Lanny testified that he had never seen that person before, mistakenly identified Johnny as S-1 from a six-pack, and corrected that mistake when he saw Johnny in person at the live lineup.
Lanny was extensively and exhaustively cross-examined about what he himself did and observed at the time of the incident.[2] The only questions he refused to answer concerned the identity of the people who approached him after the incident regarding the identity, not of appellant, but of S-1. Like the questions about the witness's drug supplier in Negrete-Gonzales, supra, 966 F.2d at page 1280, the unanswered questions to Lanny concerned a collateral matter that "only peripherally related to" Lanny's direct testimony. The questions were not "closely related to the commission of the crime" (Cardillo, supra, 316 F.2d at p. 613), "related solely to [Lanny's] credibility as a witness[,] and had no relation to the subject matter of his direct examination" (id. at p. 611). We therefore find that the questions regarding who spoke to Lanny about S-1 were not material.
Appellant argues, however, that if he had known who spoke to Lanny about S-1, that information might have led him to S-1, S-2 and other percipient witnesses, who might have provided information to impeach the identifications of him that were made by Lanny, Joel and Rodney. He analogizes this case to other types of witness problems, such as informers who are material witnesses (Eleazer v. Superior Court (1970) 1 Cal.3d 847, *1641 849 [83 Cal.Rptr. 586, 464 P.2d 42]), percipient witnesses whose safety is in danger (Alvarado v. Superior Court (2000) 23 Cal.4th 1121, 1146-1147 [99 Cal.Rptr.2d 149, 5 P.3d 203]), and invocation by reporters of the newsman's shield law (Fost, supra, 80 Cal.App.4th 724).
Appellant's attempted analogies are not applicable.
Lanny's testimony that he personally saw the shootings is supported by (1) Joel's and Rodney's testimony that Lanny was in the room, and (2) Officer Vizcarra's testimony that Lanny immediately reported that the shooter was "Duck" when Vizcarra arrived at the scene shortly after the shooting.
Lanny was a percipient witness who was present at the trial and was fully cross-examined about his observations of the shootings and his subsequent identifications of the perpetrators. Lanny knew appellant and repeatedly identified him. His undisclosed sources told him that he mistakenly identified Johnny as S-1, the other shooter. The sources never suggested either that they themselves witnessed the incident or that Lanny's identification of appellant was mistaken.
We therefore conclude that (1) the questions Lanny refused to answer on re-cross-examination concerned a collateral issue and not a material issue, (2) Lanny was fully cross-examined on all subjects that were material, and (3) there was no violation of appellant's federal constitutional rights to due process of law or to confront and cross-examine witnesses in the rulings about Lanny's testimony.
Moreover, assuming arguendo that there was any federal constitutional error, there was no prejudice. (Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 87 S.Ct. 824].) The problem of misidentification always concerned S-1 and not appellant. Much of Lanny's testimony about the incident repeated what the jury had already heard from the two victims, Joel and Rodney. Lanny and Rodney both knew appellant and were positive he was one of the two shooters. Joel did not previously know appellant, but he also repeatedly identified appellant as the person he saw approach him just before he was lifted up from behind and shot. Lanny was extensively cross-examined about why he refused to disclose his source of information about S-1. The jury received a strongly worded special instruction regarding how it should evaluate Lanny's refusal to answer questions. We therefore find that, assuming any error in the rulings about Lanny, the error was harmless beyond a reasonable doubt.

*1642 2. The Sentencing Issue

There was no finding of premeditation. The penalty for the attempted murders in counts 1 and 2 was therefore a determinate term of five, seven or nine years (Pen. Code, § 664, subd. (a)), plus applicable enhancements.[3]
For count 1, the court imposed the middle term of seven years, plus 25 years to life for a firearms enhancement under section 12022.53, subdivision (d). For count 2, the court added a full consecutive sentence of seven years for the offense, plus 25 years for the firearms enhancement. It stayed the two other counts and the great bodily injury enhancements, resulting in a total sentence of 64 years to life.
Appellant contends that the penalty for the offense in count 2 should have been two and one-third years, one-third of the midterm, instead of the full middle term. In other words, appellant seeks to invoke the provision of the Determinate Sentencing Act (DSA; § 1170 et seq.) that requires the subordinate term to consist of one-third of the middle term. (§ 1170.1, subd. (a).)
(5) The DSA applies only when all terms of imprisonment are determinate, i.e., of a specified duration. (People v. Mason (2002) 96 Cal.App.4th 1, 15 [115 Cal.Rptr.2d 359], citing inter alia People v. Reyes (1989) 212 Cal.App.3d 852, 856 [260 Cal.Rptr. 846].) The DSA does not affect, and is not applicable to, sentences that provide for imprisonment for life. (People v. Felix (2000) 22 Cal.4th 651, 659 [94 Cal.Rptr.2d 54, 995 P.2d 186], citing § 1170, subd. (a)(3).) A 25-year-to-life enhancement under section 12022.53, subdivision (d) is an indeterminate term. (See In re Cervera (2001) 24 Cal.4th 1073, 1081-1082, fn. 3 [103 Cal.Rptr.2d 762, 16 P.3d 176].) "Where there are both determinate and indeterminate sentences, the provisions of the DSA, and more particularly section 1170.1, do not apply." (Mason, at p. 15.)
When, as here, count 1 involves a life sentence, and the term is therefore indeterminate, the sentence on count 1 is no longer a principal sentence by virtue of the DSA, and the DSA does not apply. It follows that the term on count 2 is not a subordinate sentence, "the period of imprisonment is not limited to one-third of the midterm," and "[t]he full term may be imposed." (People v. Reyes, supra, 212 Cal.App.3d at p. 856.) Thus, the trial court did not err in imposing a full seven-year middle term sentence for the attempted murder in count 2.

*1643 DISPOSITION
The judgment is affirmed.
Rubin, Acting P. J., and Mohr, J.,[*] concurred.
NOTES
[1] The prosecutor argued to the jury that the defense witnesses Don and Latanya were wrong when they testified that appellant was not in the club room when the shootings occurred.
[2] Appellant's briefing states that Lanny "absolutely refused to be cross-examined about the detailed testimonial observations he had related on direct examination." Actually, there was extremely detailed and repetitive cross-examination of Lanny on that subject.
[3] All further statutory references are to the Penal Code.
[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.