Filed 11/13/14  P. v. Bernal CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E057853 |
| v. | (Super.Ct.No. SWF1200272) |
| SERGIO BERNAL, | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Mark Mandio, Judge.

Affirmed.

Patrick J. Hennessey, Jr., under appointment by the Court of Appeal, for

Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney

General, Julie L. Garland, Assistant Attorney General, and Peter Quon, Jr., Quisteen S.

Shum and Minh U. Le, Deputy Attorneys General, for Plaintiff and Respondent.

# I.  INTRODUCTION

Defendant and appellant Sergio Bernal drove a stolen car.  When a police officer attempted to stop the car for a code violation, defendant sped away, parked the car in an apartment complex parking lot, and walked away.  As officers attempted to apprehend him, he ran away.  When he was caught, he physically struggled with an officer before being subdued.  He then gave a false name to one of the officers.

Defendant was charged with unlawfully taking or driving a vehicle (count 1; Veh. Code, § 10851, subd. (a)) (hereafter section 10851), receiving a stolen vehicle (count 2; Pen. Code, § 496d, subd. (a)), providing false identification to an officer (count 3; Pen. Code, § 148.9, subd. (a)), and resisting arrest (count 4; Pen. Code, § 148, subd. (a)(1)).

At trial, defendant testified that he bought the car and did not know it was stolen. He said he received a bill of sale from the seller and produced the document at trial.  He explained that he ran from police because he believed he had violated parole and wanted to "stay out."

After a recess taken during the prosecution's cross-examination of defendant, defendant announced that he was "done" and would not testify further.  As a consequence, the court struck defendant's testimony regarding the bill of sale, excluded the bill of sale itself, and told the jurors that they could consider defendant's refusal to testify in evaluating his credibility.

The jury convicted defendant on counts 1, 3, and 4; count 2 (receiving stolen property) was dismissed in the interests of justice.  In a bifurcated court trial, defendant

2

admitted allegations of certain prison priors and a prior strike, and the court found the allegations true.  He was sentenced to nine years in prison.

Defendant makes the following contentions on appeal:  (1) the prosecutor's cross-examination of defendant regarding his prior convictions exceeded the bounds of a pretrial ruling and constituted misconduct; (2) the trial court erred in striking defendant's testimony regarding the bill of sale; (3) the court erred in refusing to give a requested instruction on the claim-of-right defense; and (4) the evidence is insufficient to sustain the section 10851 conviction.

We agree with defendant's argument regarding the claim-of-right instruction, but conclude that the error was harmless.  We reject defendant's other contentions.  We therefore affirm the judgment.

## II.  FACTUAL SUMMARY

A.  *Prosecution Evidence*

In the early morning of January 19, 2012, Juan Fuentes's green Honda Accord was parked in front of Fuentes's house in Hemet.  Sometime between 3:00 a.m. and 4:00 a.m. that morning, Fuentes started the engine of the Accord to warm it up before going to work.  As the car idled, Fuentes walked back into his house to get coffee.  He heard the car door slam.  Fuentes stepped outside and saw his car being driven away.  He could not see the person driving the car.  Fuentes reported the theft to police.

Three days later, in the afternoon of January 22, 2012, Hemet Police Officer Bryan Anderson was in his patrol car driving westbound on Latham Avenue in Hemet.  He saw

3

defendant driving eastbound on Latham Avenue in a green Accord. The Accord did not have a front license plate. After defendant passed him, Officer Anderson made a U-turn to make an "enforcement stop" of the vehicle. He did not activate his siren or overhead lights.

The officer saw defendant accelerate through a four-way stop at the intersection of Latham Avenue and Santa Fe Street without stopping. Defendant turned left (northbound) onto Santa Fe Street without using his left turn signal. At that point, Officer Anderson lost sight of the car. He gave police dispatchers a description of the car.

A dispatcher notified Officer Anderson that the car had been seen pulling into an apartment complex on Santa Fe Street, and that the occupants got out of the car and were walking east on Latham Avenue. Soon afterward, Officer Anderson saw defendant and another person walking into an alleyway adjacent to an apartment complex near the intersection of Santa Fe Street and Latham Avenue. This apartment complex was not the complex where the Honda had been parked. When defendant and his companion saw the officer, they turned and ran "as fast as they could" into the apartment complex. Around that time, Officer Anderson received word from dispatch that the Accord had been reported stolen.

Other officers arrived and a perimeter was established around the apartment complex defendant was seen entering. Defendant was spotted running away from the apartment building. Officer Anderson and two other officers chased after defendant and

4

ordered him to stop. Defendant ran into a hobby store where he was apprehended after a struggle with one of the officers.

Sergeant Daniel Reinbolt was in a police car with defendant. Defendant told Sergeant Reinbolt his name was "Mario Bernal" and his birth date was "October 15, 1927." When the sergeant questioned the year of his birth, defendant said, "'77. I meant '77." When Sergeant Reinbolt checked police records using that name and birth date, there was no match. Later, when he searched using only the last name "Bernal," he found defendant's real name and birth date of October 27, 1977.

Defendant told Sergeant Reinbolt that he ran from the officers "because every time he gets contacted by the police he gets beat up." He also said he ran because he wants to be with his son, not in jail.

When defendant was told he would be charged with driving a stolen vehicle and fleeing from the officers, he told Sergeant Reinbolt: "I don't know anything about that." He did not tell the officer that he had purchased the vehicle or that he did not know it was stolen.

A search of defendant turned up keys, but they were never checked to see if they fit the stolen Accord. He did not have with him any record of car title, registration, or a bill of sale for the car.

B. *Defense*

Defendant testified that he was asleep at his mother's house at the time the Accord was stolen. That morning, he awoke around 8:45 a.m., helped his mother with yard

5

work, then went to work with a relative on a home remodeling project. That afternoon, he and a friend went to a home improvement store to buy paint. In the parking lot of the store, defendant saw a 1993 green Honda Accord with a "for sale" sign that read, "$1,000 OBO." Two people, who identified themselves as Ruben and Olivia Moreno, were standing near the car.

Ruben told defendant his uncle had given him the car. There was nothing about the appearance of the car to cause defendant to think the car might be stolen. Ruben had the "[n]ormal Honda keys" to the car. There were no broken windows, and the locks and ignition did not appear to be damaged.

Defendant and Ruben reached an agreement whereby defendant would buy the car for $800; he would pay $400 at that time in exchange for immediate possession of the car and a bill of sale;[1] he would pay the remaining $400 on February 2, 2012, when Ruben would deliver the car's pink slip to him. He believed the transaction was legitimate.

Defendant gave Ruben $400; Ruben wrote out a bill of sale, gave it to defendant, and gave him the car. Defendant drove the Morenos to his mother's house to show them where to complete the transaction on February 2. Defendant then drove the Morenos to their apartment complex on Santa Fe Street—the same complex where defendant left the car shortly before being arrested.

---

[1] As explained below, the court subsequently excluded and struck all evidence regarding the bill of sale.

On January 22, 2012, defendant drove to the Morenos' apartment complex to talk to Ruben about getting the pink slip to the car before February 2. He did not know that a police vehicle was following him and did not try to get away from the officer. Defendant parked the car at the Morenos' apartment complex. He knocked on their apartment door, but there was no answer. He decided to walk to a friend's apartment nearby. He left the car parked at the Morenos' apartment complex so that they would see it and wait for defendant to return.

Defendant explained that he ran when he saw the police officer because he believed there was a warrant out for him "for absconding," and that he wanted to "stay out" to be with his family and son. He was also concerned because he has had a "lot" of "negative experiences" with police officers.

Defendant admitted giving Sergeant Reinbolt a false name. He said he did so because he did not want to go to jail. He believed he was being arrested for a parole violation. When Sergeant Reinbolt told him the Accord had been stolen, defendant responded: "'I don't know. I don't know what you're talking about.'"

At trial, defendant produced the bill of sale for the Accord that Ruben had given to him. He explained that prior to his arrest he had given the bill of sale to his girlfriend for safekeeping. While in jail awaiting trial, he wrote to his girlfriend to get the bill of sale. She mailed it to him, and he gave it to an attorney.

C. *Defendant's Decision to Stop Cross-examination*

After the prosecutor cross-examined defendant for approximately 45 minutes, a lunch recess was taken. At the end of the recess, defendant informed the court that he was "done" and would not testify further. The court and counsel then discussed how the court should respond. The prosecutor argued that the court should strike defendant's testimony in its entirety. The prosecutor expressed particular concern about the fact that he had not yet gone "deep into" questioning defendant about the bill of sale. Defense counsel requested that the jurors be informed of defendant's decision and that they could consider that fact in determining defendant's believability, but that defendant's testimony be allowed to stand.

The court decided to inform the jurors that defendant had chosen not to continue testifying, and that they could consider that choice in determining whether and to what extent to believe defendant's testimony, but that it did not necessarily destroy his credibility. The court also excluded the bill of sale and struck defendant's testimony relating to the bill of sale. The court explained that this result "is a balanced alternative. It still leaves the defendant with some opportunity to present his defense under the circumstances, but allows the jury to draw . . . [a] negative inference of credibility from his refusal to continue to testify and strikes, what, for him, is a key piece of evidence . . . because [the prosecutor has not] had a chance to fully cross-examine on the issue."

The court then instructed the jury as follows: "The defendant, Mr. Bernal, has refused to continue to testify. Because Mr. Bernal has refused to testify further, the

8

People, through their representative, Mr. Mason, have been deprived to [*sic*] the right for a full and fair cross-examination of Mr. Bernal's testimony. Therefore, I am ordering that the bill of sale and Mr. Bernal's testimony related to the bill of sale be stricken from the record. You are not to consider the bill of sale or Mr. Bernal's testimony relating to the bill of sale for any purpose. Furthermore, you may consider Mr. Bernal's refusal to testify further in determining the believability of the rest of his testimony."

D. *Rebuttal*

In the prosecution's rebuttal case, an investigator testified that he spoke with the owner of the apartment complex where the Morenos purportedly lived and with five of the eight tenants of the complex. The investigator found no indication that Ruben or Olivia Moreno ever lived at that complex.

An audio recording of a police interview with defendant was played to the jury. At the outset, defendant said his birthday was October 15, 1977. The officer subsequently discovered defendant's real name and his birth date of October 27, 1977.

### III. DISCUSSION

A. *Prosecutorial Misconduct*

Defendant contends the prosecutor's manner of questioning defendant about his prior convictions exceeded the bounds of a pretrial ruling and constituted misconduct. We find no error.

Defendant refers to the following portions of the prosecutor's cross-examination:[2]

"Q [PROSECUTOR]: Sir, you've been convicted of several crimes in the past; isn't that right?

"A That's right.

"Q These are crimes that show a lack of honesty on your part, aren't [they]?

"A Never.

"[DEFENSE COUNSEL]: Objection. Motions in limine. I think we covered this.

"THE COURT: You can answer that question.

"Q [PROSECUTOR]: You can answer that question, sir.

"A I've never been convicted of receiving stolen property or GTAs.

"Q That's not what I asked you, sir, is it?

"A You asked me if I've been convicted of this crime.

"Q I asked you if the crimes you've been convicted of involve crimes that show a lack—that show you're a dishonest person?

"[DEFENSE COUNSEL]: Objection. That's speculation, and I don't think my client can testify to that. It's argumentative as well.

"THE COURT: All right. I'm going to—you asked the previous question.

"[Defendant], I'm going to ask you to answer the previous question. I'm going to reread it.

---

[2] Although lengthy, we include all the excerpts relied upon by defendant because the tenor of the questioning is not adequately reflected in smaller parts.

"These are crimes that show a lack of honesty on your part, aren't they?

"[DEFENDANT]:  Yes.

"Q  [PROSECUTOR]:  Now, you were convicted January 22, 1998, of a crime that shows lack of honesty on your part; isn't that correct?

"A  On what date?

"Q  January 22, 1998, is when you committed the crime that you were convicted of; is that correct?

"A  Yes. [¶] . . . [¶]

"Q  [PROSECUTOR]:  Sir, prior to the last few questions that I asked, you said you'd never been convicted of a theft crime; is that correct?

"A  Correct.

"Q  But on January 4, 2005, you committed a [Penal Code section] 459, second, which is entering a residential building with the intent to commit a theft or a felony therein; is that correct?

"[DEFENSE COUNSEL]:  Objection.  Misstates the evidence, I think, as to residential.

"[PROSECUTOR]:  I meant commercial.  I apologize.  Not residential. Commercial.

"THE COURT:  All right.

"[DEFENDANT]:  That's on—be 171 North Palm.  That's my sister's house. There was nothing missing, nothing.  I didn't want them getting involved.  I admitted I

11

opened the door. I was asleep on the couch. And, uh, the police chase me there, too. I had a warrant. And nothing was missing. And that's where Steve lives. I can give you guys the number, and that's where—

"Q What did you give us?

"A 171 North Palm. That's the address.

"Q When did you give that to me.

"A To my lawyer.

"Q Okay. Steve what?

"A Brown.

"Q All right. Steve Brown, you still know him?

"A I was remodeling before I got arrested, that house.

"Q Sir, I asked you if you still know him?

"A Yes.

"Q All right. I know you have a lot to say. If you want to say it, I'll sit down in this chair and let you talk. You can get if off your chest, if that's what you'd like to do. Is that what you want?

"A Well, you're trying to—

"[DEFENSE COUNSEL]: Objection. Improper—that's not a question. It's an argument. It's improper form of a question.

"THE COURT: Sustained.

"Also, you're not going to sit down.  You're going to use question-and-answer format.

"You're going to try to answer these questions to the best of your ability and proceed in the ordinary course.

"Go ahead.

"Q  [PROSECUTOR]:  Sir, you still know Steve; right?

"A  Yes.

"Q  That's the person you said you were working for; is that correct?

"A  Yes.

"Q  We will get back to that in a minute.  I want to continue.  I want to talk to you about these other crimes.  You said [o]n August 29, 2002, you committed a crime that shows lack of honesty on your part; is that correct?

"A  Yes.

"Q  You said, 'yes,' but you shook your head left and right as though you mean 'no'?

"A  Because I don't—I don't know.  What crime was that?

"Q  Would looking at a copy of your CII or your rap sheet refresh your recollection?

"A  Can you just tell me the Penal Code or—

"[PROSECUTOR]:  Your Honor, I'm not sure how to proceed here.

"THE COURT:  You can tell him the Penal Code section.

13

"Q [PROSECUTOR]: [Penal Code section] 11379[, subdivision] (a), transportation of methamphetamine, sir.

"A Yes.

"[DEFENSE COUNSEL]: Your Honor, I'd object as to the convictions coming in, code sections.

"THE COURT: Well, overruled in this instance. Okay.

"Q [PROSECUTOR]: Does that refresh your recollection?

"THE COURT: Let me explain the rules for you.

"You're welcome to look at the piece of paper he's got if that's going to help you.

"[DEFENDANT]: Yes.

"THE COURT: You want to look at that?

"[DEFENDANT]: Can I?

"THE COURT: Yes, you can.

"[DEFENDANT]: What does my past got to do with now?

"[PROSECUTOR]: Sir, there's no question pending.

"Q [PROSECUTOR]: You don't understand how if someone has done something in the past that shows they lied that doesn't reflect at all on whether they will tell the truth now?

"[DEFENSE COUNSEL]: Objection. Argumentative.

"THE COURT: Overruled.

"Q [PROSECUTOR]: Is that what you're telling the jury?

14

"A People shouldn't lie, but people do change.

"Q We're not talking about people. We're talking about you, aren't we?

"A Yes.

"Q We're talking about what you did in the past?

"A Yes. Yes.

"Q We're talking about what you did in this case; right?

"A Right.

"Q We're talking about how you lied in this case?

"[DEFENSE COUNSEL]: Objection. Argumentative. Assumes facts not in evidence.

"THE COURT: Overruled.

"Q [PROSECUTOR]: You've admitted you lied about your name; isn't that correct?

"A Yes.

"Q You've committed crimes that show that you're not an honest person; isn't that correct?

"A I shouldn't have lied about my name, no.

"Q I'm not talking about lying about your name. I'm talking about these crimes you committed in the past over the last fourteen years. That's what I'm talking about. So let me ask you, sir, do you think that reflects on your credibility?

15

"[DEFENSE COUNSEL]:  Objection.  Calls for improper opinion. Argumentative.

"THE COURT:  Overruled.

"Q  [PROSECUTOR]:  You may answer.

"A  What was the question again?

"Q  Do you think what you've done in the past to where this jury has heard that you lied, where this jury has heard you committed crimes that show you were dishonest, do you think that reflects on your credibility?

"A  Yes.

"Q  Would you agree that someone who lies about something, lies to get out of trouble, can't be trusted?

"[DEFENSE COUNSEL]:  Objection.  Argumentative.

"THE COURT:  All right.  Sustained.  I'm going to ask you to just proceed with the convictions.  [¶]  . . .  [¶]

"Q  . . . Now, let's go back to, you said that [o]n August 29, 2002, you were convicted of [Penal Code section] 11379; is that correct?

"A  Yes.

"Q  Transportation?

"A  Yes.

"Q  Is that a crime where you don't really do that out in the open?

"A  Is that a crime—out in the open?

16

"[DEFENSE COUNSEL]: Objection. This has been ruled on, your Honor.

"THE COURT: All right. Sustained.

"Q [PROSECUTOR]: January 24, 2004, you committed another crime that calls into question your ability to be honest and truthful?

"A Yes.

"Q January 4, 2005, you committed the [Penal Code section] 459, second, another crime that calls into question your ability to be truthful?

"A Yes. [¶] . . . [¶]

"Q [PROSECUTOR]: Sir, would you like me to give you specific examples of specific crimes that you committed where you lied about what you did?

"[DEFENSE COUNSEL]: I'm objecting. [Evidence Code section] 352. Motions in limine.

"THE COURT: This is [Evidence Code section] 352. Move to the next subject.

"Q [PROSECUTOR]: Have you committed—have you lied to get out of trouble in the past?

"[DEFENSE COUNSEL]: Asked and answered. Same objection.

"[PROSECUTOR]: I believe, given the answers he's given—

"THE COURT: Overruled.

"You can answer.

"[PROSECUTOR]: I want to clarify. I want this jury to know.

17

"THE COURT:  Wait.  Stop.  I'll allow the [question] to be answered, and you asked a different one.  We're going to ask the question you just asked.  I'm going to ask the question be read back, please.

"(The record was read by the court reporter.)

"THE COURT:  That's the question.

"Have you lied to get out of trouble in the past?

"[DEFENDANT]:  I honestly don't remember.

"Q  [PROSECUTOR]:  Would looking at reports from the crimes you committed help refresh your recollection?

"[DEFENSE COUNSEL]:  Your Honor, objection, for the reasons given before. [Evidence Code section] 352.  Motions in limine.

"THE COURT:  I'm going to sustain this on [Evidence Code section] 352."

1. Motion in Limine Regarding the Use of Defendant's Prior Convictions for Impeachment

Prior to trial, the court and counsel discussed the prosecution's anticipated use of defendant's prior convictions for impeachment.  The court specified which prior convictions could be used.  (This ruling is not an issue on appeal.)  In addition, there was discussion as to what counsel could say about the prior convictions and how the court

would instruct the jury on the matter. The court indicated that it would instruct with CALCRIM NO. 316.**3**

As for the manner of questioning, defendant contends that an "apparent agreement" was reached whereby counsel would be limited to questioning defendant as to whether he had suffered the specified prior convictions. We disagree. Neither the citations to the record provided by defendant nor a reading of the entire transcript of the hearing support such an agreement. Although the court indicated that counsel should not inquire about "the facts of the prior convictions" or refer to the crimes as "crimes of moral turpitude," the record does not reveal a more explicit ruling regarding the form or manner of questioning or any agreement among the parties. In the absence of a clear ruling on this point, we reject defendant's argument that the prosecution exceeded the bounds of any ruling or agreement on the matter.

2. Prosecutorial Misconduct

In addition to arguing that the prosecutor's questions exceeded the bounds of an agreement or ruling made during the discussion regarding motions in limine, defendant contends that the prosecutor's conduct violated his right to due process under the United States Constitution, as well as state law.

---

**3** CALCRIM No. 316, as given in this case, provides: "If you find that a witness has been convicted of a felony, you may consider that fact only in evaluating the credibility of the witness's testimony. The fact of a conviction does not necessarily destroy or impair a witness's credibility. It is up to you to decide the weight of that fact and whether that fact makes the witness less believable."

19

The standard for reviewing claims of prosecutorial misconduct is well-settled: "'Under California law, a prosecutor commits reversible misconduct if he or she makes use of "deceptive or reprehensible methods" when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted. [Citation.] Under the federal Constitution, conduct by a prosecutor that does not result in the denial of the defendant's specific constitutional rights—such as a comment upon the defendant's invocation of the right to remain silent—but is otherwise worthy of condemnation, is not a constitutional violation unless the challenged action "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"' [Citations.]" (*People v. Dykes* (2009) 46 Cal.4th 731, 760.)

Defendant does not focus his argument on any particular questions; rather, the claim is directed at the prosecutor's decision "to couch all of his questions regarding the prior convictions in accusatory terms suggesting that the prior conviction showed [defendant] was a dishonest person, lied at the time of those offenses and was lying during his testimony at this trial." Defendant adds that the "questions posed by the prosecutor were not only argumentative but also suggested by their form that the prosecutor personally believed [defendant] was lying to the jury." Finally, he contends that the "tenor of the questioning and the questions permitted by the court were to inflame the passions of the jury and created a situation in which [defendant's] trial was negatively and unfairly impacted."

20

We agree that some of the prosecutor's questions were improper or argumentative, and that the prosecutor pursued the matter of defendant's prior convictions to the point of constituting an undue consumption of time. (See Evid. Code, § 352.) As the record reveals, the trial court ultimately sustained defense counsel's objections on these grounds and told the prosecutor to "[m]ove to the next subject."

However, we reject defendant's contention that the prosecutor's questions were so deceptive or reprehensible as to constitute misconduct under state law, or that they deprived defendant of due process. Because defendant testified at trial, his veracity was an issue in the case and the prosecution was permitted to ask defendant about his prior felony convictions involving moral turpitude. (See *People v. Castro* (1985) 38 Cal.3d 301, 306; *People v. Gray* (2007) 158 Cal.App.4th 635, 641; Evid. Code, § 788.) Although there is always a danger that the jury will misuse the evidence of prior convictions for purposes other than impeachment, this risk is reduced when, as in this case, the court instructs the jury with CALCRIM No. 316. (See *People v. Gray, supra,* at p. 642.) As for the form or manner of questions to which an objection was made, the impropriety was appropriately dealt with by the court's responses to objections. If and to the extent the court overruled an objection that should have been sustained, the questions were not so egregious as to constitute misconduct under state or federal law. We therefore reject defendant's prosecutorial misconduct claims.

21

B.  *Striking of Defendant's Testimony Regarding Bill of Sale*

On appeal, defendant contends the court erred in striking his testimony regarding the bill of sale he received from Ruben.

As set forth above, after about 45 minutes of cross-examination, defendant refused to testify further.  After hearing the argument of counsel, the court informed the jurors of defendant's decision and instructed them (1) not to consider evidence of the bill of sale and (2) they may consider defendant's refusal to testify in determining the believability of his testimony.

The applicable legal principles and our standard of review are not disputed. "Essential to a fair trial is that the accused have the opportunity to exercise his fundamental, constitutional right to be heard in his own defense by testifying at trial." (*People v. Reynolds* (1984) 152 Cal.App.3d 42, 45 (*Reynolds*).)  The defendant's right to testify "must be considered in light of the principle that '[w]hen a defendant voluntarily testifies in his own defense the People may "fully amplify his testimony by inquiring into the facts and circumstances surrounding his assertions, or by introducing evidence through cross-examination which explains or refutes his statements or the inferences which may necessarily be drawn from them." [Citation.]' [Citation.]" (*Id.* at p. 46.) "[T]he right of cross-examination takes on added significance where the witness's credibility is of special significance to the proceedings." (*People v. Seminoff* (2008) 159 Cal.App.4th 518, 527 (*Seminoff*).)  When the defendant refuses to testify on cross-examination, the prosecution is deprived of its right to subject defendant's claims "to 'the

greatest legal engine ever invented for the discovery of truth,' cross-examination. [Citation.]" (*Reynolds, supra,* at p. 46.)

A trial court that is presented with the situation of a testifying witness who refuses to answer questions on cross-examination has discretion to strike the entirety of the witness's testimony, strike part of the testimony, or allow the trier of fact to consider the witness's failure to answer in evaluating the witness's credibility. (*Reynolds, supra,* 152 Cal.App.3d at pp. 47-48; *Seminoff, supra,* 159 Cal.App.4th at p. 526; *People v. Miller* (1990) 50 Cal.3d 954, 999.) In exercising its discretion, the trial court should consider the witness's motive in refusing to testify and the materiality of the testimony he or she has refused to give. (*Reynolds, supra,* at pp. 47-48.) In addition, before employing the "drastic solution" of striking the witness's entire testimony, the court should consider whether less severe remedies are available. (*Ibid.*; accord, *Seminoff, supra,* at p. 526.)

The trial court's ruling was not an abuse of its discretion. Initially, we note that defendant did not explain his motive for not testifying. After a recess, the prosecutor asked the court to take up an "issue that just came up." The court then asked defendant: "It's my understanding, [defendant], you don't want to testify any further?" Defendant responded: "I'm done." After some discussion among the court and counsel, the following colloquy with defendant took place:

"THE COURT: I should ask you one more question, [defendant]. [¶] If I order you to take the stand and continue testifying, will you obey my order or disobey my order?

23

"THE DEFENDANT:  I'll disobey your order.

"THE COURT:  You are refusing to testify further?

"THE DEFENDANT:  Yes, your Honor.

"THE COURT:  I'm going to actually—I'm going to order you to complete your testimony.  What is your response?

"THE DEFENDANT:  Well, I refuse—

"THE COURT:  You're refusing?

"THE DEFENDANT:  —to take the stand, your Honor.

"THE COURT:  And testify.

"THE DEFENDANT:  I already testified, your Honor."[4]

Thus, this is not a case where, as in *Reynolds, supra,* 152 Cal.App.3d 42, the defendant refused to answer questions because doing so would implicate others and make him a "snitch."  (*Id.* at p. 45.)  Nor does this case involve a witness who, like the witness in *Seminoff, supra,* 159 Cal.App.4th 518, testified for the defense at a suppression hearing, then invoked the Fifth Amendment and refused to answer specific questions on the ground the answers would incriminate her.  (*Id.* at pp. 524-525.)  Here, it appears that defendant had simply had enough of testifying, and declared he was "done."  Needless to

---

[4] By the time this colloquy took place, the court had already indicated, with defendant present, that it would strike the evidence of the bill of sale and instruct the jury that it may consider the refusal to testify in evaluating defendant's believability. Defendant was thus aware of the likely consequences of his decision when he reiterated his refusal to testify.

24

say, this is not a very good reason. Consideration of defendant's motive for not testifying, therefore, does not weigh in his favor.

Attempting to evaluate the materiality of the testimony defendant refused to give in this case is a somewhat speculative endeavor. Unlike other cases where the witness refused to answer specific questions (see, e.g., *Reynolds, supra,* 152 Cal.App.3d at p. 45 [refusal to answer question calling for names of accomplices]; *Seminoff, supra,* 159 Cal.App.4th at p. 526 [refusing to answer question asking about her intent to sell marijuana]), the record does not indicate what specific questions the prosecutor planned to ask. However, the record does support the prosecutor's assertion that he had not gone "deep" into cross-examination regarding the bill of sale. Shortly before the lunch recess, the following colloquy occurred:

"[PROSECUTOR]: Now, let's go back to when you say that you got this car. [¶] All right. Mr. Moreno is the one who wrote out the bill of sale; isn't that right?

"A Correct.

"Q You're telling this jury Mr. Moreno did that on this own. It was his idea; right?

"A It was our idea to give me the bill of sale for now.

"Q How'd that go?

"A It went fine. He wrote it on the hood of the car, had his lady sign it, and this, then I signed it.

"Q Whose idea was that?

25

"A  Both of ours, mine and Ruben's.

"Q  Who suggested it first?

"A  Me."

The prosecutor then moved on to other matters before the lunch recess was taken.

In light of the prosecutor's brief questioning regarding the bill of sale, the court could reasonably accept the prosecutor's representation that he "didn't get deep into [the bill of sale] yet" and "intended to go farther into it with the defendant."  Because defendant prevented the prosecution from delving deeper into the subject matter of the bill of sale, striking defendant's testimony regarding the bill of sale is reasonable and within the court's discretion.

Finally, we note that the court's ruling did not deprive defendant of a defense. Defendant's defense was that he believed he had purchased the car and did not know it had been stolen.  On direct examination, defendant testified in some detail about his purchase of the car from Ruben, including the terms of payment.  While a portion of his testimony included his description of the bill of sale, the court's ruling striking the evidence of the bill of sale did not affect the remainder of his testimony regarding the transaction.  His counsel was still able to, and did, discuss defendant's testimony regarding the transaction during his closing argument.  Counsel stated, for example: "Important thing, my client testified what he heard and what he saw and he provided real specific details in his testimony about this transaction.  He remembered what these people looked like.  He remembered even some details, like, actions that they took, things that

they did together after the transaction, like driving these people back to an apartment they said they lived at, [defendant] saying that he brought them to his mother's house. There's some real specifics there that I think add to the credibility of that statement." Although the evidence regarding the bill of sale would certainly have supported this defense, excluding such evidence did not deprive defendant of the defense.

For all the foregoing reasons, we conclude that the court did not abuse it discretion in striking evidence of the bill of sale or instructing the jury as it did.

## C. *Failure to Give Claim-of-right Defense Instruction*

Defendant requested to instruct the jury with CALCRIM No. 1863 regarding the defense of claim of right.[5] The court denied the request, stating: "I do not think it applies in these circumstances. I do think—this is more classic to the robbery scenario or embezzlement scenario. However, if [defense counsel] can find a case that applies to

---

[5] CALCRIM No. 1863 provides:

"If the defendant obtained property under a claim of right, (he/she) did not have the intent required for the crime of (theft/ [or] robbery).

"The defendant obtained property under a claim of right if (he/she) believed in good faith that (he/she) had a right to the specific property or a specific amount of money, and (he/she) openly took it.

"In deciding whether the defendant believed that (he/she) had a right to the property and whether (he/she) held that belief in good faith, consider all the facts known to (him/her) at the time (he/she) obtained the property, along with all the other evidence in the case. The defendant may hold a belief in good faith even if the belief is mistaken or unreasonable. But if the defendant was aware of facts that made that belief completely unreasonable, you may conclude that the belief was not held in good faith. [¶] . . . [¶]

"If you have a reasonable doubt about whether the defendant had the intent required for (theft/ [or] robbery), you must find (him/her) not guilty of _____ <insert specific theft crime>."

27

[section] 10851 or vehicle theft or possession-of-stolen-vehicle context, then I'll reconsider." Defendant contends the court's ruling was error. We agree.

On appeal, we review de novo a claim of instructional error. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) We review the legal correctness of the court's ruling, not the court's reasoning. (*People v. Zapien* (1993) 4 Cal.4th 929, 976.)

Under the claim-of-right defense, a defendant charged with theft-related crimes does not have the requisite intent if the defendant obtained the property with a good faith belief that he or she had a right to the property, even if that belief is mistaken. (CALCRIM No. 1863; *People v. Tufunga* (1999) 21 Cal.4th 935, 938, 943.) As the Supreme Court explained: "Although an intent to steal may ordinarily be inferred when one person takes the property of another, . . . proof of the existence of a state of mind incompatible with an intent to steal precludes a finding of either theft or robbery. It has long been the rule in this state and generally throughout the country that a bona fide belief, even though mistakenly held, that one has a right or claim to the property negates felonious intent. [Citations.] A belief that the property taken belongs to the taker [citations], or that he had a right to retake goods sold [citation] is sufficient to preclude felonious intent. Felonious intent exists only if the actor intends to take the property of another without believing in good faith that he has a right or claim to it." (*People v. Butler* (1967) 65 Cal.2d 569, 573, fn. omitted, overruled on another ground in *People v. Tufunga, supra,* at p. 956.) The defense is applicable to "all theft-related charges."

(*People v. Tufunga, supra,* at pp. 952-953, fn. 4; see also *People v. Williams* (2009) 176 Cal.App.4th 1521, 1526-1527; *People v. Russell* (2006) 144 Cal.App.4th 1415, 1428.)

Defendant was not charged with theft; he was charged with taking or driving a vehicle unlawfully under section 10851.  A person commits a violation of section 10851, subdivision (a) by taking or driving "a vehicle not his or her own, without the consent of the owner thereof, and with intent either to permanently or temporarily deprive the owner thereof of his or her title to or possession of the vehicle, whether with or without intent to steal the vehicle . . . ."  The crime can thus be committed "either by taking a vehicle with the intent to steal it or by driving it with the intent only to temporarily deprive its owner of possession (i.e., joyriding)."  (*People v. Allen* (1999) 21 Cal.4th 846, 851.)  Because the crime can be committed by merely *driving* (without *taking*) a vehicle and with the intent to deprive the owner of possession *temporarily*, the crime "is technically not a 'theft.'"  (*People v. Montoya* (2004) 33 Cal.4th 1031, 1034, fn. 2; see also *People v. Garza* (2005) 35 Cal.4th 866, 871 [unlawful driving of a vehicle under § 10851 is not a form of theft].)

We have not found any published case addressing whether a claim of right can be a defense to a charge of violating section 10851.  However, the rationale for the defense in theft cases applies equally to section 10851.  Just as a "belief that the property taken belongs to the taker," negates the felonious intent required of theft (*People v. Butler, supra,* 65 Cal.2d at p. 573), a belief that the vehicle taken (or driven) belongs to the taker (or driver) negates the intent to deprive—either permanently or temporarily—the owner

29

of title or possession. Stated differently, one who has a bona fide belief, even though mistakenly held, that the vehicle he is driving is his does not have the intent to deprive the vehicle's owner of title or possession for any length of time for purposes of section 10851. (Cf. *Butler, supra,* at p. 573.) Therefore, by parity of reasoning, the defense of claim of right should and, we hold, does apply to a charge of violating section 10851.[6]

In a criminal case, "the trial court must instruct on the general principles of law relevant to the issues raised by the evidence. [Citations.] The general principles of law governing the case are those principles closely and openly connected with the facts before the court, and which are necessary for the jury's understanding of the case." (*People v. St. Martin* (1970) 1 Cal.3d 524, 531.) In addition, a defendant has a right to an instruction upon request that pinpoints the crux, or theory, of the defense when there is evidence to support the defense. (*People v. Jones* (2012) 54 Cal.4th 1, 81; *People v. Wright* (1988) 45 Cal.3d 1126, 1137.) Such pinpoint instructions must be given upon request even when, as here, the defense merely negates the intent element of the crime on which the jury is properly instructed. (See *People v. Romo* (1990) 220 Cal.App.3d 514, 517.)

We note that a different rule applies in the absence of a request for such an instruction. In *People v. Anderson* (2011) 51 Cal.4th 989, the Supreme Court held that the trial court did not have a sua sponte duty to instruct on the defense of accident

---

[6] Although the Attorney General argues that the evidence does not support the giving of the claim-of-right instruction *in this case*, she does not contend that the defense is inapplicable as a matter of law to a charge of violating section 10851.

because that defense merely negates the mental state element of the charged crime. (*Id.* at pp. 996-998.) The court noted, however, that "the defendant would have been entitled to a pinpoint instruction relating his theory of accident to the evidence of intent, but only *upon request.*" (*Id.* at p. 998, fn. 3.) In *People v. Lawson* (2013) 215 Cal.App.4th 108 [Fourth Dist., Div. Two], this court applied the holding of *Anderson* to the defense of mistake of fact and any other defense that operates only to negate the mental state element of the crime. (*People v. Lawson, supra,* at p. 117.) Relying on *Anderson*, we stated: "'''[W]hen a defendant presents evidence to attempt to negate or rebut the prosecution's proof of an element of the offense, a defendant is not presenting a special defense invoking *sua sponte* instructional duties. While a court may well have a duty to give a "pinpoint" instruction relating such evidence to the elements of the offense and to the jury's duty to acquit if the evidence produces a reasonable doubt, such "pinpoint" instructions are not required to be given *sua sponte* and must be given only upon request.''' [Citation.]' [Citation.]" (*Ibid.*, quoting *People v. Anderson, supra,* 51 Cal.4th at pp. 996-997.) Thus, while *Anderson* and *Lawson* hold that trial courts have no sua sponte duty to instruct on defenses that merely negate the mental state element of a crime, they also reaffirm that the court must instruct on such defenses *upon request*.

"A trial court must give a requested instruction only if it is supported by substantial evidence . . . ." (*People v. Marshall* (1997) 15 Cal.4th 1, 39.) "''''Substantial evidence is evidence sufficient to "deserve consideration by the jury," that is, evidence that a reasonable jury could find persuasive.''''' (*People v. Benavides* (2005) 35 Cal.4th

31

69, 102.) Sufficient evidence to support the claim-of-right may be supplied solely by the defendant's own testimony. (*People v. Tufunga, supra,* 21 Cal.4th at p. 944.) "'"In evaluating the evidence to determine whether a requested instruction should be given, the trial court should not measure its substantiality by weighing the credibility [of the witnesses] . . . . Doubts as to the sufficiency of the evidence to warrant instructions should be resolved in favor of the accused. [Citations.]" [Citation.]' [Citation.]" (*Ibid.*; see also *People v. Romo, supra,* 220 Cal.App.3d at p. 519.)

Here, defendant's testimony provided sufficient evidence to support the requested claim-of-right instruction. Defendant testified that he purchased the Accord from Ruben for the price of $800. He gave Ruben $400 for immediate possession of the car and promised to give Ruben the remaining $400 in exchange for the pink slip approximately two weeks later. The transaction took place in a commercial parking lot during the day time. According to defendant, there was nothing about the appearance of the car to make him suspect the car was stolen. This was consistent with the prosecution's evidence that the thief took the keys along with the car and did not have to break into the car. Based on the description of the transaction, defendant's testimony that he believed the transaction was legitimate was, on its face, plausible. Even without the bill of sale, defendant's testimony, if believed, was sufficient to establish that he held a good faith belief that the car was his. The court therefore erred in refusing to give the claim-of-right instruction.

32

The error is subject to the *Watson*[7] test for harmless error.  (Cf. *People v. Sojka* (2011) 196 Cal.App.4th 733, 738; *People v. Hanna* (2013) 218 Cal.App.4th 455, 462.) Under this test, we will reverse the conviction if, "'after an examination of the entire cause, including the evidence' [we are] of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson, supra,* 46 Cal.2d at p. 836.)  In determining whether such a reasonable probability exists, we will take into consideration the jury's factual findings on other instructions.  (See, e.g., *People v. Moore* (2011) 51 Cal.4th 1104, 1132; *People v. Moye* (2009) 47 Cal.4th 537, 556-557.)

Significantly, the jury was instructed as to the defense of mistake of fact, and rejected the theory.  In particular, the jury was told:  "If you find that the defendant believed that the motor vehicle was not stolen, he did not have the specific intent or mental state required to commit the crimes of Unlawful Taking or Driving of a Vehicle or Receiving a Stolen Motor Vehicle."[8]  By convicting defendant of these crimes, the jury necessarily rejected the assertion that defendant believed the Accord was not stolen, which implies the finding that defendant believed the car *was* stolen.

---

[7] *People v. Watson* (1956) 46 Cal.2d 818.

[8] The quoted instructions are the written instructions.  The instructions given orally on this point differ in one respect.  The oral version of the first clause is:  "If you find that the defendant believed that he lawfully purchased the motor vehicle not knowing it was stolen . . . ."  The difference does not appear to be substantive.  Also, the written instructions control over any discrepancy with the oral instructions.  (*People v. Wilson* (2008) 44 Cal.4th 758, 803.)

If the jury had been given the claim of right instruction, it had to acquit defendant if it found that defendant "believed in good faith that [he] had a right to" to the Accord, "even if the belief is mistaken or unreasonable." (CALCRIM No. 1863.) Having implicitly concluded that defendant believed the car was stolen, if the jury was to acquit defendant based on the claim of right defense, it would have had to conclude that the defendant believed the car was stolen and yet still held a good faith belief that he had a right to the Accord, or, stated differently, that defendant had a good faith belief he had a right to possess a stolen car.

Because a good faith belief under the claim-of-right defense can exist even if it is mistaken or unreasonable, it is theoretically possible to have a mistaken, unreasonable, good faith belief in the right to possess a stolen car purchased from another. Thus, the jury's rejection of the mistake of fact defense does not *necessarily* mean that the jury would have also rejected the claim-of-right defense. Nevertheless, while *possible*, we conclude that such a result is not, in this case, "reasonably probable" for purposes of *Watson*. The evidence supporting the defense consisted primarily of defendant's testimony regarding the purchase of the car and evidence establishing the lack of indicia of a break-in or punched ignition. Such evidence supported the defendant's contention that he did not know the car was stolen. This contention, however, was rejected by the jury when it rejected the mistake of fact defense. There was no evidence to support the further possibility that he believed the car to be stolen but nevertheless believed he could rightly possess it. We are convinced, therefore, that the jury, having rejected the mistake

34

of fact defense, would not have acquitted defendant if it had been further instructed as to the claim-of-right defense.

Defendant relies on *People v. Russell, supra,* 144 Cal.App.4th 1415 for support. In *Russell*, the defendant possessed a stolen motorcycle. (*People v. Russell, supra,* 144 Cal.App.4th at pp. 1420-1421.) He testified that he had found the motorcycle and believed it had been abandoned. (*Id.* at pp. 1422-1423.) He was convicted of receiving a stolen motor vehicle. (*Id.* at p. 1419.) On appeal, the defendant argued that the court erred in failing to instruct the jury on the defenses of mistake of fact and claim of right. The Court of Appeal agreed and concluded that the errors were prejudicial because there was "relatively strong" evidence that the defendant believed the motorcycle had been abandoned. (*Id.* at pp. 1431-1433.) *Russell* is distinguishable because the jury in that case had not been instructed on either claim of right *or mistake of fact*. The fact that the jury in our case was instructed on mistake of fact and implicitly rejected defendant's primary contention that he did not know the car was stolen is fundamental to our conclusion that the failure to instruct on claim of right was harmless. Because the *Russell* jury was not instructed as to mistake of fact, that case is not controlling here.

D. *Sufficiency of Evidence to Sustain Conviction for Vehicle Theft Under Section 10851*

Defendant contends the evidence is insufficient to convict him under section 10851. We disagree.

To establish a violation of section 10851, the prosecution must prove the defendant (1) took or drove a vehicle without the owner's consent and (2) the defendant

35

had the specific intent to permanently or temporarily deprive the owner of title or possession. (*People v. O'Dell, supra,* 153 Cal.App.4th at p. 1574.)

Regarding the first element, defendant contends there is no "evidence to suggest he was the person who actually took the vehicle on the morning" it was taken from Fuentes. Fuentes, defendant points out, was unable to identify the gender or other characteristics of the person who took his vehicle. This argument is misplaced because the prosecution is not required to prove that defendant "actually took the vehicle"; it is enough to establish that defendant *drove* the vehicle without the owner's consent. (*People v. Allen, supra,* 21 Cal.4th at p. 851.) Defendant admitted he drove the vehicle and Fuentes testified that he did not give defendant his consent. The first element is easily satisfied.

It is not clear from defendant's appellate briefs whether he is arguing that the evidence was insufficient to support the jury's finding as to the second, specific intent element. To the extent he is making that argument, it is rejected.

"Intent is a state of mind. A defendant's state of mind must, in the absence of the defendant's own statements, be established by the circumstances surrounding the commission of the offense." (*People v. Mincey* (1992) 2 Cal.4th 408, 433; see also *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction."].)

Here, there was evidence that defendant ran a stop sign and sped away when he began to be followed by a police officer. He then parked in an apartment complex parking lot, leaving the car parked in an awkward manner that suggested he was in a hurry to leave the scene and get away from the car. Contrary to defendant's testimony, there was evidence that the Morenos did not live in that apartment complex. When a police officer saw him walking away from the car, defendant ran away. After he was apprehended, police found no documents in defendant's possession or in the car evidencing defendant's legal title to the car. Jurors could reasonably infer from such behavior that defendant knew the car he was driving was stolen. From the fact that defendant was driving the car with such knowledge, jurors could further infer that he intended to deprive the owner of possession, at least temporarily. The evidence was therefore sufficient to support the conviction for violating section 10851.

## IV. DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

KING
J.

We concur:

McKINSTER
Acting P. J.

CODRINGTON
J.

37