Filed 4/14/15  P. v. McNeil CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B250116 |
| Plaintiff and Respondent, | (Los Angeles County |
| v. | Super. Ct. No. MA046976) |
| GERALD L. McNEIL, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County. Lisa Mangay Chung, Judge.  Affirmed.

John Doyle, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Noah P. Hill and Roberta L. Davis, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted appellant Gerald L. McNeil of two counts: attempted willful, deliberate, and premeditated murder (Pen. Code, §§ 664, 187, subd. (a);[1] count 1); and attempting to dissuade a witness (§ 136.1, subd. (a)(2); count 2). As to count 1, the jury also found true the firearm and gang allegations (§§ 12022.53, subds. (b)-(d), 186.22, subd. (b)(5)).[2] Appellant was sentenced to three years plus 40 years to life in state prison as follows: On count 1, a life sentence plus 15 years to life for the gang enhancement, plus 25 years to life for the firearm enhancement; on count 2, the upper term of three years. The sentences on the remaining enhancements were stayed.

Appellant contends: (1) the record does not support the trial court's acceptance of the prosecutor's race-neutral reasons for excusing African-American jurors; (2) the trial court erred in refusing to instruct the jury on third party culpability; (3) the trial court erred in refusing to strike the victim's testimony when she failed to name the person who told her about an offer from appellant's family not to testify; and (4) there was insufficient evidence to support the primary activities of appellant's gang. We disagree and affirm the judgment.

## FACTS

**Prosecution Case**

### *Events Leading to the Shooting*

In 2009, Lajoi Davis (Davis) lived on the second floor of an apartment complex in Palmdale, California. Tiara Turner (Turner) lived in the same complex. Appellant is Turner's brother. In August 2009, Davis and Turner became involved in an ongoing dispute. Turner's family members repeatedly called Davis and threatened to "jump" her, and regularly loitered near Davis's apartment, trying to intimidate her.

On September 14, 2009, Davis and her mother were heading back to Davis's apartment when Davis received a call warning her that almost 30 people were waiting outside her apartment. Davis called some friends and family members, about 10 of

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

[2]     A first jury deadlocked and a mistrial was declared.

2

whom came to her apartment, including her sister Crystal Goodridge (Goodridge) and two or three men.

It was agreed that Davis and Turner would physically fight each other to end the dispute. Davis and her friends and family went downstairs to meet Turner and her group in the street. Appellant was standing at the bottom of the stairs. As Davis and her group walked down the stairs, appellant made several statements including the word "Bloods," which Davis and Goodridge took to mean that appellant was claiming membership in the Bloods gang. Goodridge responded, "Fuck slobbs, cuz." "Slobb" is a derogatory term for a Bloods gang member. "Cuz" is a term used by Crips gang members, who are enemies of Bloods gang members. Goodridge was not a member of the Crips gang. She made the statement because she knew it would anger appellant, and she was mad that he was yelling at Davis's group.

Davis and Turner began to fight. Then several people in both groups began fighting around Davis and Turner. One of the onlookers was Sylvia Huerta (Huerta), who lived in the apartment complex. Huerta saw an older Caucasian woman get hit by both a man and a woman during the fight. Huerta saw a man strike appellant, who ran down the street saying, "I'll be back."

After the fighting stopped, someone yelled, "He got a gun. He got a gun." People started running in different directions. Huerta and Davis saw appellant running towards the crowd with a gun in his hand. Davis testified that appellant ran to an older Caucasian woman and asked, "Mom, who hit you?" Huerta testified that appellant stopped and asked her who hit his mother or mother-in-law. She responded that she did not know. Appellant then ran inside the apartment complex. Davis crouched alongside a car, then ran into her neighbor's first-floor apartment.

### The Shooting

Goodridge ran from the street toward Davis's second-floor apartment. As she approached the stairs, she saw appellant coming down the stairs with a gun. She stopped. Appellant looked straight at Goodridge and raised the gun. Goodridge put up her hands in defense. Appellant fired several shots at Goodridge as he went down the stairs.

3

Goodridge was struck five times. Bullets broke her arm, pierced her lung, and lodged in her shoulder and pelvis. When the shooting stopped, Goodridge looked away from appellant. When she looked back up, he was gone. Goodridge was able to move; she went to her car in the parking lot, intending to drive herself to the hospital. Before Goodridge had driven a block, she saw police cars in her rearview mirror. She made a u-turn and flagged down sheriff's deputies, who helped her. She was ultimately airlifted by helicopter to the hospital.

Davis heard the gunshots and looked outside the window. She saw appellant hand something to Lavell Prince Clayton (Clayton). Both men got into a car that was waiting for them.

### The Investigation, Arrest, and Jailhouse Calls

Following an anonymous tip, Los Angeles County Sheriff's Detective Edwin Barragan obtained a photograph of appellant that was taken about 10 days before the shooting and used it to create a six-pack photographic lineup. The photographic lineup was shown to Davis, Huerta, and Goodridge, each of whom immediately and without hesitation identified appellant as the shooter.

Appellant was arrested at his home on October 9, 2009. A silver sedan parked at appellant's residence matched the description of the car in which appellant and Clayton were seen leaving the scene of the shooting. Clayton was arrested when witnesses pointed him out to law enforcement as he sat in the audience at appellant's preliminary hearing.

While appellant was in jail, several of his phone calls to his wife Claudine Sims (Sims) and his girlfriend Jaiquisha were recorded and played for the jury. In an October 13, 2009, recorded call, appellant said he thought the only reason "she" remembered his face was because he "intimidated" people, "making everybody get out there and fight." In an October 14, 2009, recorded call, Sims asked appellant who he wanted her to instruct "to talk to her to get close to her." Appellant asked who was "out there," and Sims responded, "Sparkle." Appellant said, "Yeah man somebody, somebody

4

who can get close to a homie and let her know like, man shit, this is a nigga life on the line." Sparkle was Sparkle Harris, who was Turner's friend.

In an October 18, 2009, recorded call, appellant told Jaiquisha, "What's done [is] done but damn, I can't replace what was done homie. You feel me? All I can do is try to look forward homie. I been asking for forgiveness since I been locked up." Appellant also said he was going to ask to represent himself, so his trial would be postponed. He did not want to hire an attorney until after he had delayed the trial. He made references to using the delay so his friends and family could find out whether Goodridge would testify against him or whether they could give the money for an attorney to Goodridge instead. In an October 27, 2009, recorded call, appellant told Sims that he wanted Turner to find out if Goodridge was "still trying to do the thing or if she gonna come." Sims said that Sparkle Harris spoke with someone, and "she said that she was letting it go."

### *Gang Evidence*

Appellant had Bloods and All for Crime (AFC) gang tattoos. When he was arrested at his home, officers found an Oakland A's hat and an Anaheim Angels hat, both of which had "A" symbols on them. Appellant's moniker was "Chachi."

Los Angeles Police Department Officer Bryan Schilling testified as a gang expert. The AFC gang is a subset of the Bloods gang and claims territory within the area policed by Officer Schilling's gang unit. The AFC gang associates with the letter "A," and the Bloods gang with the color red, so AFC members often wear Anaheim Angels hats. The AFC gang has a common hand sign. The gang's primary activities are committing petty theft, vandalism, assault with a deadly weapon, weapons violations, robberies, narcotics violations, and murder. AFC members had committed predicate offenses.

Based on appellant's tattoos, his possession of baseball hats bearing the "A" symbol, and field identification cards indicating that he was affiliated with the AFC gang, Officer Schilling opined that appellant was a member of the AFC gang. He explained that a person could be beaten or murdered for having tattoos of a gang to which he did not belong. Based on a hypothetical question mirroring the facts of this case, Officer Schilling opined that the shooting was committed because the shooter, a gang member,

5

could not allow himself or his gang to be disrespected in front of so many witnesses without repercussions. By shooting a person who disrespected the gang, a gang member demonstrated that the gang would do anything to stick up for itself and disrespect would not be tolerated. This would send a message to the community that AFC members are violent, causing fear in the community, which allows the gang to more easily commit future crimes without being reported.

**Defense Case**

Alice Beverly (Beverly), who was Caucasian, was at the apartment complex the day of the shooting with her daughter Dominique, who was best friends with Turner. During the fighting in the street before the shooting, Beverly was struck by a man known as "Wild Child." Max Watson (Watson), who was the father of Dominique's child, was also present during the fight. Watson is African-American, like appellant, and approximately the same height as appellant.

Turner and Clayton testified that "Chachi" was not appellant's gang moniker, but a family nickname. They also testified that at the time of the shooting, they were involved in a group fight down the street from where the main brawl was happening. Some of the men from Davis's group had chased Clayton down the street, and appellant and Turner came to help him.

Although she knew of the accusations against her brother, Turner never contacted law enforcement to provide him with the alibi she gave at trial. Clayton served two years in prison after pleading guilty to accessory after the fact, for having received the gun after the shooting in this case. However, he testified that he did not actually receive the gun in this case; he only pled guilty because his mother begged him to, so he could get out of custody.

Clayton testified that he never saw Watson at the scene, and he "never knew [Watson] to drive a car." But defense investigator Michael Florio testified that when he interviewed Clayton in prison, Clayton said that Watson drove a silver-colored car.

Appellant testified that on the day of the shooting, he was on parole for a conviction of possession of narcotics for sale. Being in Palmdale put him in violation of

6

his parole because it was outside the 50-mile radius of Los Angeles in which he was allowed to travel. He went to Palmdale because his sister Turner called him. Appellant was sitting on some steps at the apartment complex when people started going out to the street for the fight. Appellant told Turner and Davis that they should fight in the field so the approximately 40 onlookers would not get involved, and so the women would not get in trouble with their building manager, but the women ignored him and fought in the street.

At some point during the fight, Turner fell to the ground. Appellant and his cousin pushed Turner back up. Goodridge then tried to "charge in," and appellant struck Goodridge. A man struck appellant, and the two fought for a few minutes. Appellant saw Clayton being chased down the street, and ran after Clayton, telling him to stop and fight. Clayton did and one of the men chasing him jumped on him. Appellant pulled the man off and told the group to give Clayton a one-on-one fight. One of the men agreed and fought Clayton. Appellant heard gunshots and ran away.

Appellant denied shooting Goodridge, and saying anything involving the word "Blood." If he had said anything about a gang, he would have said something about AFC. He did not hear Goodridge say, "Fuck slobbs." If he had, he might have immediately reacted to the insult, or he might not have, because a gang member does not get "credit" for "slapping a girl." Appellant had no animosity toward Goodridge.

Appellant testified that he was an "ex-member" of the AFC gang, which was a tagging crew and appellant was a tagger. At some point, AFC became a Bloods gang, and appellant was not part of this group. When appellant used the term "Blood" during his recorded jailhouse calls, he used the term as one might use "homie."

Dr. Mitchell Eisen testified as an expert on memory, eyewitness identification, and suggestibility. Based on a hypothetical scenario, Dr. Eisen opined that, due to unconscious transference, witnesses may have identified appellant as the shooter from the photographic lineup because the shooter made loud comments about someone having struck his mother, and appellant had made "loud provocative" comments prior to the fight.

7

**Prosecution Rebuttal Evidence**

Goodridge testified that when she said, "Fuck slobbs, cuz" to appellant, she said it loudly so he would hear because she was upset about his statements. Before appellant shot Goodridge, as he was coming down the stairs, they made eye contact. Although she put up her hands defensively, she could still see appellant during part of the shooting. Sometime after the shooting, a male acquaintance told Goodridge that appellant's family was offering her $5,000 because of the shooting. No offer was actually made from any member of appellant's family, and Goodridge would not have accepted any money if it had been offered.

A photograph of appellant's wife giving the hand symbol for the Bloods gang was shown to the jury.

Detective Barragan testified that the name Max Watson was never provided to him during his initial investigation. When Detective Barragan interviewed defense witnesses and other witnesses to the shooting who were on Turner's side in the fight, none of them mentioned Watson. Detective Barragan did not learn about Watson until after the preliminary hearing in this case. He searched his department resources, but was unable to find anyone named Max Watson who lived near Palmdale or Lancaster and was born in the 1980's or 1990's.

When Detective Barragan interviewed Turner, she was not cooperative, and denied that either she or appellant were at the scene of the fight and shooting.

In an October 31, 2009, recorded jailhouse call between appellant and Sims, appellant instructed Sims to make sure that his shorts were moved to his mother's. It was undisputed that appellant was wearing shorts the day of the shooting.

**Defense Surrebuttal Evidence**

Dominique testified that "Max" was not Watson's first real name; it was Brian. At the time of the shooting, Dominique was entering her sister's apartment with her mother and Watson.

Turner testified that the first time she was interviewed by Detective Barragan, she told him she was scared and that appellant did not shoot anyone. Detective Barragan told

8

her, "And you are going to go down with him if you don't tell me." Turner insisted her brother was innocent, and the interview concluded.

## DISCUSSION

## I.  No Error In Denial of Appellant's *Batson/Wheeler*[3] Motion

Appellant contends that the trial court erred by denying his *Batson/Wheeler* motion.  Specifically, he argues that the record does not support the trial court's acceptance of the prosecutor's race-neutral explanations for exercising peremptory challenges as to two of the three African-American jurors.  We find no error.

### A.  Background

After the prosecutor used three of eight peremptory challenges against African-American jurors (prospective jurors Nos. 0892, 1727 & 1366), defense counsel made a *Batson/Wheeler* motion outside the presence of the jury.  Only one African-American and another prospective juror of dark complexion remained on the panel.  The trial court noted that appellant was African-American, found that defense counsel had made a prima facie case of discrimination, and asked the prosecutor to explain his challenges.  The prosecutor noted that almost all of the "witnesses on the victim's side" were African-American, so there was no "distinct advantage" to be gained by the prosecution by excusing African-American jurors.

The prosecutor then explained:  "Juror Number 1366 in seat number 7 who I last excused is a corrections officer.  And with corrections officers and probation officers, I just feel that they have seen so much on both sides that they are always a wild card.  And it is just unpredictable.  So that was the reason for her.  [¶]  As to Juror Number 0892, the male black who was last in seat number 5, as well as Juror Number 1727 who was in seat number 10, both of those, as we and the court talked to them, my view was that they were both slow.  They were oftentimes lost during the conversations.  And so it is for those reasons that they were excused."

---

**3**      *Batson v. Kentucky* (1986) 476 U.S. 79 (*Batson*) and *People v. Wheeler* (1978) 22 Cal.3d 258 (*Wheeler*).

The trial court ruled, "Based on the prosecutor's explanation, I find those to be sufficiently race neutral reasons and will deny the *Wheeler* motion."

### B.  Applicable Law

The use of peremptory challenges to strike prospective jurors on the basis of group bias violates the United States and California constitutions.  (*Batson*, *supra*, 476 U.S. at p. 89; *Wheeler*, *supra*, 22 Cal.3d at pp. 276–277.)  "Procedures governing motions alleging the discriminatory use of peremptory challenges are settled.  'First, the defendant must make out a prima facie case "by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose."  [Citation.]  Second, once the defendant has made out a prima facie case, the "burden shifts to the State to explain adequately the racial exclusion" by offering permissible race-neutral justifications for the strikes.  [Citations.]  Third, "[i]f a race-neutral explanation is tendered, the trial court must then decide . . . whether the opponent of the strike has proved purposeful racial discrimination." [Citation.]'"  (*People v. Riccardi* (2012) 54 Cal.4th 758, 786.)

The trial court must make a sincere and reasoned attempt to evaluate the proffered explanation for challenging the juror in light of all of the circumstances.  (*People v. Fuentes* (1991) 54 Cal.3d 707, 718.)  "'[T]he issue comes down to whether the trial court finds the prosecutor's race-neutral explanations to be credible.  Credibility can be measured by, among other factors, the prosecutor's demeanor; by how reasonable, or how improbable, the explanations are; and by whether the proffered rationale has some basis in accepted trial strategy.'"  (*People v. Riccardi, supra,* 54 Cal.4th at p. 787.)

"Accordingly, because the trial court is 'well positioned' to ascertain the credibility of the prosecutor's explanations and a reviewing court only has transcripts at its disposal, on appeal '"the trial court's decision on the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal" and will not be overturned unless clearly erroneous.'"  (*People v. Riccardi, supra,* 54 Cal.4th at p. 787.)

*C. Analysis*

Appellant concedes that the record supports the trial court's acceptance of the prosecutor's race-neutral explanation that he excused prospective juror No. 1727 because the juror was "slow" and appeared confused during questioning. But appellant argues that the record does not support accepting this same reason for excusing prospective juror No. 0892. We have reviewed the reporter's transcript and agree with the People that it shows that prospective juror No. 0892's colloquy with the trial court was awkward at best, demonstrating that the juror did not communicate well. Moreover, the record does not reveal the juror's demeanor, which the trial court was able to observe. For example, the record does not disclose the manner in which the answers were given, or whether the juror expressed confusion in his tone of voice or facial expressions. (See *Snyder v. Louisiana* (2008) 552 U.S. 472, 477 ["a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous," because "race-neutral reasons for peremptory challenges often invoke a juror's demeanor (e.g., nervousness, inattention), making the trial court's firsthand observations of even greater importance"]; *People v. Lenix* (2008) 44 Cal.4th 602, 626 [trial court is in the best position to evaluate the legitimacy of prosecutor's reasons for excusing a juror because it witnesses the totality of the circumstances, "including matters not discernable from the cold record," such as a juror's demeanor and tone of voice].) The record here does not demonstrate that the prosecutor's reason for excusing prospective juror No. 0892 was pretextual.

We reject appellant's argument that the trial court did not make a sincere and reasoned effort to evaluate the prosecutor's credibility. While the trial court's ruling was brief, it expressed that the court had considered the prosecutor's explanations and found them to be credible. (See *People v. Mai* (2013) 57 Cal.4th 986, 1053 [trial court's "terse" ruling that there was no discriminatory intent inherent in the prosecutor's explanations, and the reasons appeared to be race neutral, demonstrated that the court had made a sincere and reasoned effort to assess the credibility of the prosecutor's reasons]; *People v. Jones* (2011) 51 Cal.4th 346, 361 [sincere and reasoned effort was made where the trial court heard from prosecution, invited defense counsel to comment, and denied the motion

11

without further comment; nothing in the record suggested the court was unaware of, or failed to perform, its duty to evaluate the credibility of the prosecutor's reasons].)

Regarding prospective juror No. 1366, a corrections officer, appellant argues the prosecutor's race-neutral explanation required the trial court to make further inquiry, because the explanation implied that the prosecutor was excusing a neutral juror in order to seat a juror who was biased in favor of the prosecution. To the contrary, the explanation made clear that the prosecutor was unwilling to take the risk that the prospective juror would be biased in favor of the defense due to her job. This is a legitimate race-neutral reason for exercising a peremptory challenge. (See *People v. Thompson* (2010) 49 Cal.4th 79, 107 [trial court properly denied *Batson/Wheeler* motion where prosecutor excused juror who was a correctional officer due to the possibility that she had a "built-in 'affinity towards prisoners'"]; *People v. Reynoso* (2003) 31 Cal.4th 903, 925 [prosecutor "can challenge a potential juror whose occupation, in the prosecutor's subjective estimation, would not render him or her the best type of juror to sit on the case for which the jury is being selected"].) Thus, the trial court was not required to conduct further inquiry. (*People v. Jackson* (1996) 13 Cal.4th 1164, 1198 ["This court has further held that *Wheeler* does not require the trial court to conduct further inquiry into the prosecutor's race-neutral explanations if, as here, it is satisfied from its observations that any or all of them are proper"].)

Accordingly, the record supports the trial court's denial of appellant's *Batson/Wheeler* motion.

## II. No Error In Refusal to Instruct the Jury on Third Party Culpability

Appellant contends that the trial court erred in failing to instruct the jury on third party culpability. We find no error.

### A. *Background*

While the parties were discussing jury instructions during trial, defense counsel renewed his request that a jury instruction be given on third party culpability as to Watson. Defense counsel explained his theory as follows: "My theory is that the witnesses actually heard Max Watson and that he was a perpetrator. He had a motive.

12

His mother-in-law was being beaten by probably Crystal Goodridge and Arthur Taylor. At least she was seen being beaten by an African American male and a heavyset African American woman, that Max Watson went looking for these people, and he was trying to find out who they were. And as he passed Dominique Beverly and her mother, Alice Beverly, he asked her, 'Who hit you, Mom?' That person, then Lajoi Davis, she has no doubt did the shooting. That is not [appellant]. That is someone else, and it seems to be Max Watson."

The trial court ruled that the evidence as developed was too speculative to warrant giving the instruction, which was also based on hearsay, because there was no direct or circumstantial evidence linking Watson to the shooting.

### B. Applicable Law

In determining whether to give requested instructions on third party culpability, courts often rely, as did the trial court here, on the language in *People v. Hall* (1986) 41 Cal.3d 826, 833: "To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime."

### C. Analysis

The trial court correctly found that there was insufficient evidence of third party culpability to warrant giving appellant's requested instruction because there was no evidence linking Watson to the shooting. For example, there was no evidence that any witness saw Watson with a gun, saw him commit the shooting, or saw him near the staircase where the shooting occurred. Indeed, the only person who testified about Watson's whereabouts at the time of the shooting was Dominique, who, on defense surrebuttal, testified that Watson was with her entering her sister's apartment when they

13

heard the gunshots. There was no physical evidence connecting Watson to the shooting. At best, the evidence showed that Watson had a motive and opportunity to commit the shooting, which is insufficient by itself to warrant the instruction. Accordingly, the trial court did not err in declining to instruct the jury on third party culpability.

## III. No Error in Denying Appellant's Motion to Strike Goodridge's Rebuttal Testimony

Appellant contends that the trial court violated his rights to confrontation and a fair trial by declining to strike Goodridge's testimony when she refused to name the person who told her about the $5,000 offer from appellant's family.

### A. Background

On rebuttal, Goodridge testified that none of appellant's family members had offered her money, but that she had heard about an offer. When the prosecutor asked what she had heard, defense counsel objected on the ground of hearsay. The trial court overruled the objection, then stated, "The jurors are admonished not to consider this for their truth but the effect that it has on her. [¶] Does everyone understand that in terms of evaluating her credibility?" The jurors responded affirmatively. Goodridge then testified that she heard someone was trying to give her money because of the shooting. She testified that she never accepted any money for the shooting and that she would not have accepted money to drop the charges if it had been offered.

On cross-examination, Goodridge declined to identify the person who told her about the offer, explaining that the person was not in court and she did not want to get the person involved. Defense counsel asked again for the name, and the prosecutor objected on the ground that it was not relevant because the offer evidence had been presented only as to Goodridge's state of mind. The trial court sustained the objection. When defense counsel asked how she knew the person was accurately reporting the offer, Goodridge responded, "Because they told me face-to-face." After defense counsel asked again for the name, and the prosecutor's relevance objection was again sustained, the court held a sidebar.

14

Defense counsel argued that if he was not allowed to obtain the name of the person making the offer, he would be denied effective cross-examination and would move to strike Goodridge's entire testimony, direct and rebuttal. The trial court stated, "She clearly has concerns with giving out the name or identity of the person. For the limited purpose that this is being offered, you will be allowed to question as to the relationship, any details of the time and place, and also to comment during closing arguments regarding her reluctance or refusal to give out that name and any bearing that may have on her credibility." The court denied the motion to strike Goodridge's testimony.

Goodridge then testified that the person who told her about the offer was a male acquaintance she had known for seven or eight months. He was not a member of appellant's family. He told her about the offer outside her apartment sometime in 2009, and said he had heard about the offer from his baby's mother.

### B. Applicable Law

The right to confront and cross-examine witnesses is essential to due process. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 294.) Thus, in a criminal trial, a witness's refusal to submit to questions on material issues on cross-examination may be grounds for striking all or part of the witness's testimony. (*People v. Price* (1991) 1 Cal.4th 324, 421; *People v. Seminoff* (2008) 159 Cal.App.4th 518, 525.) In determining whether to strike a witness's testimony for refusal to answer questions on cross-examination, the court should consider the motive of the witness and the materiality of the answer. (*People v. Seminoff, supra*, 159 Cal.App.4th at pp. 525–526; *People v. Reynolds* (1984) 152 Cal.App.3d 42, 47.)

Striking the witness's testimony is a "drastic solution, which is to be used after less severe means are considered." (*People v. Reynolds, supra*, 152 Cal.App.3d at pp. 47–48; Alternatives should be considered "when the witness has refused to answer one or two questions on cross-examination on matters that are collateral, such as credibility." (*People v. Sanders* (2010) 189 Cal.App.4th 543, 556.) Less severe means include striking a portion of the witness's testimony or informing the jury that the witness's refusal to answer questions may be considered in assessing the witness's credibility.

(*People v. Seminoff, supra,* 159 Cal.App.4th at p. 526; *People v. Reynolds, supra*, 152 Cal.App.3d at p. 48.)  The decision to strike all, part, or none of a witness's testimony due to the witness's refusal to answer questions is reviewed for an abuse of discretion, "and the refusal to answer only one or two questions need not lead to the striking of the testimony."  (*People v. Daggett* (1990) 225 Cal.App.3d 751, 760; *People v. Price, supra*, 1 Cal.4th at p. 421.)

### C. Analysis

The trial court did not abuse its discretion by denying appellant's motion to strike Goodridge's testimony simply because she refused to name the person who told her about the offer.  Goodridge made clear that she did not want to identify the person by name because she wanted to protect him.  She answered all of defense counsel's other questions about the offer, thus demonstrating that she was not trying to impede the defense.

We agree with the People that the identity of the person who told Goodridge about the offer was not crucial to an effective cross-examination of Goodridge.  The evidence about her learning of the offer was presented to the jury for the sole purpose of showing its effect on her state of mind, and was therefore relevant to her credibility.  (See *People v. Burgener* (2003) 29 Cal.4th 833, 870 ["It is not necessarily the source of the threat—but its existence—that is relevant to the witness's credibility"].)  Indeed, defense counsel argued to the jury that Goodridge's refusal to name the person made her less credible.  Nor was the evidence relevant to the second charge of attempting to dissuade a witness, because the jury was expressly instructed that Goodridge's testimony about the offer could not be used to prove such an offer was made.  Appellant's own words in his jailhouse calls was more than sufficient to support this charge.

Appellant argues that the evidence regarding the offer was inadmissible because it was hearsay that did not fall within the state of mind exception of Evidence Code section 1250 (which refers to the state of mind of the declarant), and was double hearsay because the offer was told to Goodridge secondhand.  However, evidence of the offer was not presented for its truth, only for its effect on Goodridge.  Thus, it was not hearsay and its

16

admissibility did not depend on any exception to the hearsay rule. (*People v. Merriman* (2014) 60 Cal.4th 1, 72 ["The evidence was admitted for a purpose other than for the truth of the matter asserted, and therefore need not have met the reliability requirements of a hearsay exception"].)

Because we find that the trial court did not abuse its discretion in denying appellant's motion to strike Goodridge's testimony, we likewise find no constitutional error. (*People v. Merriman, supra,* 60 Cal.4th at p. 72.)

**IV. Substantial Evidence Supports the Jury's True Finding on the Gang Allegation**

Finally, appellant contends that the gang enhancement must be reversed because there was insufficient evidence that the AFC gang's primary activities were offenses listed in the gang enhancement statute.

"'The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.] On appeal, we must view the evidence in the light most favorable to the People and must presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. [Citation.]'" (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206.) The same standard applies to evaluating the sufficiency of the evidence to support a true finding on an enhancement allegation. (*People v. Wilson* (2008) 44 Cal.4th 758, 806.)

Section 186.22, subdivision (b), provides for a sentencing enhancement when an offense is committed for the benefit of, at the direction of, or in association with a criminal street gang. To prove that a group is a criminal street gang within the meaning of the enhancement, the prosecution must prove that the group has as one of its "primary activities" one or more of the offenses enumerated in section 186.22, subdivisions (e)(1) to (25) and (31) to (33). (§ 186.22, subd. (f).) "The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations. [Citation.] That definition would necessarily exclude the occasional commission of those crimes by the group's members." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)

17

"Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute." (*Id*. at p. 324.)

Here, when the prosecutor asked the gang expert, Officer Schilling, "What are the primary activities of the AFC gang?" Officer Schilling responded: "It ranges and varies in crimes. It can go from petty theft, vandalism, ADW, weapons charges, robberies, narcotics, all the way up to murder." At least three of these crimes are listed in the gang enhancement statute (see § 186.22, subds. (e)(3) [murder], (4) [narcotics], (31) [weapons].)

To the extent appellant is arguing that the officer's testimony lacked foundation, his reliance on *In re Alexander L.* (2007) 149 Cal.App.4th 605 is misplaced. There, the gang expert testified that the gang's members "committed quite a few assaults with a deadly weapon, several assaults. I know they've been involved in murders. [¶] I know they've been involved with auto thefts, auto/vehicle burglaries, felony graffiti, narcotic violations.' No further questions were asked about the gang's primary activities on direct or redirect examination." (*Id*. at p. 611.) The appellate court found this testimony insufficient to establish the primary activities element because the expert failed to explain how he "knew" about these crimes, failed to give any specifics as to the circumstances of the crimes, and failed to "directly testify that criminal activities constituted [the gang's] primary activities." (*Id*. at p. 612.)

By contrast, Officer Schilling explained that his testimony was based on his familiarity with the AFC gang, his years of experience investigating gangs, speaking with gang members, and speaking with other law enforcement officers investigating gang cases. This background was sufficient to establish the officer's expertise as to the gang's primary activities. (*People v. Sengpadychith, supra*, 26 Cal.4th at p. 324 [gang expert testimony may be based on conversations with gang members, the expert's own investigation of gang-related crimes, and information obtained from other law enforcement officers].) Moreover, the officer's testimony as to the gang's primary activities was corroborated by appellant's commission of the instant shooting in

18

September 2009, and the predicate crimes evidence, which established that an AFC member committed possession of an assault weapon and sale and/or transportation of marijuana in May 2009, and another AFC member committed attempted murder and shooting at an occupied motor vehicle in January 2008. (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1465 ["Past offenses, as well as the circumstances of the charged crime, have some tendency in reason to prove the group's primary activities, and thus both may be considered by the jury on the issue of the group's primary activities"].)

Accordingly, substantial evidence supported the jury's true finding on the gang enhancement.

## DISPOSITION

The judgment is affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.

_____, Acting P. J.
ASHMANN-GERST

We concur:

_____, J.
CHAVEZ

_____, J.
HOFFSTADT